Mr. Justice Hagner
delivered the opinion of the court.
I announce the opinion of the court in the case of Strasburger vs. Commissioners of the District of Columbia.
The petition prays “ that a writ of mandamus be issued by the court commanding the defendants, the said Commissioners of the District of Columbia, to show cause why they should not issue to the plaintiff a permit to repair and reconstruct the building hereinbefore mentioned, and also transfer his license for a theater from the corner of Ninth and D streets, northwest, to the said skating rink.”
It sets forth that the petitioner had a license to carry on a theatrical business- at the corner of Ninth and D streets, in the city of Washington \ that this place of business was-destroyed by fire, and in seeking for a place to pursue his avocation, he had found a building which had been used a skating rink on E between Sixth and Seventh streets-, which he conceived tó be suitable; and he thereupon applied to the inspector of buildings for a permit to alter the rink to make it suitable for theatrical performances; and he also applied to have his license transferred, so that he could operate under it in the new place for the unexpired time; that on the 20th of December, 1886, the inspector of buildings issued the desired permit, which authorized him to make the alteration and stating expressly that the building, when altered, might be used for the purposes of a theater.
The petition further states that on the same day the Commissioners undertook to cancel that permit and withdrew it; that he then applied to them to review their action ; and that on or about the 29th day of that month he received from the Commissioners a communication stating that they declined to order the permit to issue, unless he should com *391 ply with the provisions of a regulation which they had made on that day, and which required, as a condition precedent to the issue of a permit, that a majority of the residents in the square, and of those in the opposite square, fronting the designated place, should signify thei'r approbation of the application ; and that they also declined to order a transfer of the license.
The commissioners, in their answer, admit that these several statements are substantially correct; but they say that the regulation of the 29th of December was made by them as well in virtue of their general powers, as of an act of Congress passed in 1878, referred to as part of their return, which gave them, as they allege, full power to make’and enforce building regulations; and they insist that the regulation of the 29th of December was within their competency under that law.
An objection was made in argument on the part of the defendant to the form of this application, which it is not necessary to consider; but it is proper that we should notice a substantial error in the procedure which would prevent us, in any event, from granting this application in its present form.
By the regulations and laws governing this District, there is no question that the only person authorized to issue a building permit is the inspector of buildings; and he was the official to whom the application was made by the petitioner in the first instance. The Commissioners have no function of that sort. It is equally clear that the only officer authorized to issue a license is the register. Here, then, is an application, hy a proceeding for a mandamus, which (except where it has been changed by statute, and there has been no change here) is one regulated with great strictness at the common law, calling on this court to order the Commissioners of the District to perform two distinct acts, neither of which they have legally the power to perform.
It is not necessary to cite further authority as to the law upon this point than the decision of the Supreme Court of the United States in Ex parte Howland, 104 U. S., 604. *392 There the commissioners of a county were charged with the duty of appointing a collector. They were to make the levy, which was to be placed in the hands of the collector, whose duty it was to collect the tax. They made the levy, and placed it in the hands of the collector; but he had neglected to collect it, and a mandamus was applied for to compel the county commissioners to enforce its collection. The Supreme Court says, page 611:
“ Whatever it is within the power of the creditor to compel the tax collector to do without the intervention of the court of commissioners, the commissioners are not required by the writ against them to do. Their whole duty in respect to the collection of the tax is performed when they have so far set the machinery of collection in motion that others are required to keep it going. Their obligations in this respect end where those of another public officer begin. They cannot be required by mandamus to compel another officer to do his duty, if, without their intervention, the moving party can himself accomplish the same result. It is true that under section 12 general powers are conferred, on the commissioners to carry out the provisions of the bonding act; but this does not change the rule of their liability to the bondholder in the particular now under consideration. The general principle whicli governs proceedings by mandamus is that whatever can be done without the employment of that extraordinary remedy may not be done with it. It only lies when there is practically no other remedy. As a necessary consequence, the writ must issue directly against him whose duty it is to do the thing which the parties seek to have done ; for, as was said in Reg. vs. Mayor of Derby, 2 Salk., 436; ‘It is absurd that the writ should be directed to one person to command another.’ ”
It is plain, therefore, that as this petition now stands we should be obliged to refuse the relief prayed.
We have been unwilling to confine ourselves to this objection, but have preferred to examine the important question, which has been fully argued before us, as though the application were made for relief against officials properly amendable to the process invoked.
*393 The petitioner insists that the acts he asks the court to order the municipal authorities to perform are plain, ministerial duties, which they are bound by the law to discharge upon his application ; that there is no statute or lawful ordinance or regulation forbidding prompt compliance with his demand; and especially that the regulation of the 29th of December, 1886, is inoperatve and void as an unauthorized and unreasonable exercise of municipal power.
Is this contention correct?
The act of June 14,1818, seems to have been designed to confer upon the Commissioners a power.with respect to building regulations of the most comprehensive character. It authorizes and directs the Commissioners “ to make and enforce” “such building regulations for the said District as they may deem advisable; ” and declares that “such rules and regulations made as above shall have the same force and effect within the District of Columbia as if enacted by Congress.” There is no limitation as to the character or extent of the regulations thus authorized, but the terms are broad enough to include every form of building regulations that the Commissioners may deem advisable, and which may reasonably be considered as a proper subject of regulation.
It is evident that Congress intended to confer the power to make a complete system; and the words of the act are amply sufficient for that purpose. No such system would be complete that did not embrace the power of regulating the location of buildings with reference to the purpose for which they are to be used, as well as the character of the materials and the size and form of the structures. Such provisions as to location have always existed in Washington, and the public interest requires that they should be found in every municipal government. Unless there were such regulations, any man might establish a tippling shop, a livery stable or a factory, in juxtaposition with the finest private residences or churches or public buildings, and the city government would be powerless to prevent it.
The regulation of the location of buildings is, undoubtedly, *394 as essential a branch of municipal control, for the comfort, safety and symmetry of a city, as the character of the material to be used; and we have no more right to cut down the sweeping language of the statute, so as to deprive the Commissioners of supervision of this branch of the subject so necessarily involved in any complete system of building regulations, than we would have to limit it in the other direction, by denying them the power to decide whether the buildings shall be of wood or brick.
The language of this act is much broader than that of section 79 of the,Revised Statutes of the District of Columbia, which gave specifically to the Board of Public Works the power to make all necessary regulations for the construction of buildings; since the primary sense of the word “construction” was that of edification or piling up, as of a house. And it is not unimportant to observe that this act of the 14th of June, 1878, chap. 194, was passed three days after the passage of the act of Congress, chap. 180, establishing the present form of government and which specially adopted the laws then in forcé, among them this section 79, which had been kept alive by the first act establishing the Board of Commissioners. Laws 1874, chap. 337.
It would thus appear that the act of the 14th of June must have been designed to place the power of regulation of buildings upon a broader foundation than had been expressed in section 79, already in force within the District.
We heard no authority referred to, and have been unable to find any case, showing that such general grant of power to establish building regulations does not also embrace the power to determine the location of the buildings.
It will be instructive to examine the various acts of Congress and of the municipality respecting this subject, since the origin of the city government, and observe the construction they have received. The conveyance by the original proprietors to the Commissioners, Beall and Gantt, declared that the property should be subject to “sirch terms and conditions as shall be thought reasonable by the President, for the time being, for regulating the materials and manner of *395 the buildings and improvements on the lots generally in the said city, or in particular streets or parts thereof, for common convenience, safety and order; provided such terms ■and conditions be declared before the sale of any of the said lots,” etc. Webb’s Digest, 5'6.
Under these provisions President Washington, before the sale of any of the lots, on the 17th of October, 1791, established various building regulations for the city of Washington, under no other grant of power than that contained in the trust deed, and several of his successors in office established further regulations on the subject.
The regulations ordained by these successive Presidents not only described the character of the material to be used, but also limited the size, height and area of all wooden houses, and forbade, under a penalty, their erection within certain localities, or within twenty-four feet of a brick or stone house; and yet they had no other support than the power expressed in the trust deed to “regulate the material and manner of the buildings.”
The circuit court decided, in Miller vs. Elliot, 5 Cranch C. C., 543, that a provision expressed in these regulations, constituted a condition annexed to every house lot in the city.
In 1822 all these regulations of the several Presidents up to that time were expressly adopted by an ordinance of the corporation, which went -on to forbid the erection of a frame blacksmith shop, factory, or livery stable, within fifty feet of a brick or stone house. The power to pass this last regulation was to be found nowhere else in the new •charter of 1820, except in the provision which authorized the corporation, almost in the words of the trust deed, “ to regulate, with the approbation of the President, the manner of erecting and the materials to be used in the erection of houses.” Put the charter was silent as to any express authority to make provision as to the relative location or proximity of wooden houses to other buildings.
In November, 1863 (p. 246 Webb’s Digest), the corporation, by ordinance, declared that no license should be granted *396 for a livery stable unless the assent of a majority of the people owning real estate, white housekeepers, residing on the same side and on the opposite side of the square, should first be obtained; and also that it should not be lawful to erect a livery stable within fifteen feet of the building line of any street or avenue, nor within fifty feet of any dwelling house fronting on any street or avenuej under a penalty; and it was made the duty of every proprietor of a licensed livery stable within the city of Washington to have the entire sidewalk in front of his premises paved with brick in a certain way.
There was no authority for this further legislation beyond the previous provisions of the charter authorizing the regulation of “the manner of erecting and the material to be used,” unless it can be found in the amendment to the charter in 1848 (p. 496), which authorized the corporation “to license, tax, and regulate livery stables;” but in like manner was silent as to the location of buildings or the necessity of obtaining the assent of the neighbors before the license should be granted.
The charter of 1820 (p. 492), in like manner had given to the corporation the power “to provide for licensing hotels;” but nothing was there said as to their location or as to the necessity of the assent of the neighbors. Nevertheless the corporation, by an ordinance (Webb, Digest, 222), passed in 1864, declared that no hotel or restaurant should be kept without a license being first had and obtained, and that the person applying for the license should first produce to the mayor a certificate signed by the commissioner of improvements and six respectable freeholders residing in the same square, etc.; and similar and more stringent provisions were made with respect to restaurants and tippling shops.
In like manner the charter was silent as to the necessity of the assent of the neighbors to the establishment of a retail establishment. But this was made a prerequisite by the ordinance of March, 1861 (Webb, Digest, 93), to the location of a coal, wood, or. lumber yard, in these words:
*397 “It shall not be lawful for any person or persons to establish or locate any coal yard, lumber yard or wood yard upon any new site or any site not used as such for the period of six months, within fifty feet of any dwelling house in the city, unless the person or persons desiring to establish or locate any such coal yard, lumber yard or wood yard, shall first file with the register of the city the written consent of the owner or owners, occupant or occupants, of each and every house within said fifty feet of the ground, etc., contemplated to be occupied.”
We have searched in vain through these charters, from beginning to end, for any authority to justify this requirement as a prerequisite to issuing such licenses, unless it be found in the same general power “to regulate the manner of erecting and the materials to be used in the erection of houses,” given by the charter.
In 1871 the corporations of Washington and Georgetown were abolished. The charters were continued in existence by section 95 of the Eevised Statutes only for certain specified purposes; but the laws and ordinances of the cities and of the levy court, except where modified by Congress or inconsistent with those laws, were declared to remain in full force by. section 91, E. S. D. C.
By section 2 of this organic law, as we call it, it was declared that this District was created a government by the name of the District of Columbia, by which name it was constituted a body corporate for municipal purposes; and then followed the general statement of the several important powers vested in the corporation, viz.: by that name it may “contract and be contracted with, sue and be sued, plead and be impleaded, have a seal and exercise all other powers of a municipal corporation, not inconsistent with the Constitution and laws of the United States and the provisions of this act.”
By section 79, E. S. D. C., the Board of Public Works was given the authority, already cited, to “make all necessary regulations respecting the construction of private buildings *398 in the District of Columbia, subject to the supervision of the legislative assembly.”
These being the only grants of power on this subject committed to the new corporation, let us examine how in fact it did construe these powers. In section 9, chapter 69, session 1, of the laws of the legislative assembly of the District, we find this re-enactment, in what might be called an aggravated form of the previous regulations as to coal and wood merchants, including also lumber men and livery stable keepers:
“ That the keeper of every livery stable, wood, coal or lumber yard, shall, before engaging in such business, obtain the consent, in writing, of a majority of the persons owning real estate, and a majority of the residents keeping house on the same side of the square on which is the principal front of the stable or yard about to be built or kept, and the side of the square fronting immediately opposite, for him to enter upon and engage in such business, the register to determine which is the principal front; and without such permit being first obtained, it shall be unlawful to grant such license.”
Now, what was the authority for this legislation? The most direct grant of power was that in section Í9, authorizing the Board of Public Works to make regulations concerning the construction of private buildings. But this direct grant was accompanied by the further grant of the general authority to exercise all other powers of a municipal corporation, and by the residuum of inherited power from all the antecedent laws and ordinances of the previous corporations not then repealed. In the same direction we find, in section 10 of the same act, provisions similar in substance, with reference to licenses for hotels and drinking houses, declaring that unless a majority of the residents in the neighborhood signify their consent, in writing, no license shall be given. And yet nobody questioned all this legislation, and it has been acted upon again and again, and acquiesced in by the courts as valid.
What are the powers of the present District govern *399 ment? By the Act of 18*74, chapter 3*7*7, entitled, “An Act for the Government of the District of Columbia, and for Other Purposes,” it was declared, in section 1, that all provisions of law providing for an Executive, Secretary, Legislative Assembly, Board of Public Works and delegate, were repealed; and by section 2, that all the powers then lawfully vested in the Governor or Board of Public Works should be exercised by the Commissioners, except as limited by the Act.
On the 11th day of June, 18*78, chapter 180, which is the present organic act, was passed, entitled, “An Act Providing a Permanent Form of Government for the District of Columbia.” That declares that the District, and the property and persons that may be therein, shall be subject to any existing laws applicable thereto, not thereby repealed or inconsistent with the provisions of the Aet; that the District shall remain and continue a municipal corporation, as provided in section 2 of the Bevised Statutes, “ and the Commissioners herein provided for shall be deemed and taken as officers of said corporation; and all laws now in force, relating to the District of Columbia, not inconsistent with the provisions of this act, shall remain in full force and effect.”
Whatever powers, therefore, were exercised by either of the previous governments, over the subject of buildings, by virtue of existing statutes, ordinances or regulations, belong to the present government; and in addition to these powers, there now exists the special and further power given by the Act of June 14, 18*78, under which the regulation of 29th December, 1886, was passed.
We see nothing in this long continued construction and exercise of power by the previous governments, which should induce us to decide in favor of one citizen to the annoyance of so many of his fellow-citizens, that the regulation in question is in excess of the powers thus accumulated and vested in the present Commissioners.
We consider it safer to rely upon the analogies to be deduced from our own laws than to wander into foreign juris *400 dictions, and be guided-by decisions based upon constitutions, statutes and ordinances to which we are strangers, and delivered in communities whose polity may be very different from ours.
Our own reports furnish several decisions in which the courts of the District have shown their purpose not to be astute to construe away the chartered rights of the municipality in favor of those who seels to evade the law.
Thus, in Corporation of Washington vs. Casanave, 5 Cranch C. C., 500, it was decided that, under the charter which declared that retailers might be .licensed, a license might be exacted of a coal and wood merchant, although if was argued that he was not necessarily a retailer.
Again,.in Corporation of Washington, vs. Eaton, 4 Cranch C. C., 352, it appeared that Eaton was in the habit of practicing pistol shooting within his own grounds. There was-an ordinance forbidding persons from discharging firearms within the city limits, “idly and for sport and amusement.” When charged with its violation, he denied the authority of the corporation to pass the ordinance, insisting that the powers of the municipality should be strictly construed1.. But the court held that the authority might be-found in the grant of power to prevent nuisances, as the firing of pistols under one’s widow might become a nuisance; and that it might, he further justified under the power to prevent fires; and they enforced the ordinance.
There are similar decisions to which it is mot necessary to refer, evincing that our courts have been disposed to support the rights of the public, within proper limitations, by a reasonable construction! of the powers- of the city government.
The regulation of December 29', 1886, is perfectly ira sympathy with the legislation of the corporation respecting: livery stables, wood and coal yards, hotel and drinking, houses, and kindred enterprises. The- power claimed is also in the direction of that which had' been given in the charter of 1820 (ip. 492, Webb); and also of section 3 of the Act of 1863 '(p. 136), which expressly provided that the mayor,. *401 whenever in his opinion the public interest required, might refuse to issue a license, for any exhibition for gain. This section is not expressly repealed, although there is no mayor to execute it; but we refer to the provision as further evincive, as we conceive, in a very strong degree, of the continued purpose and settled policy on that subject in the District for more than half a century.
It is evident that the present regulation of the Commissioners is in the direction of this settled policy, and it is not to be forgotten that we are dealing here with a case where an application is made for an affirmative act to be done by the officers of a great city, who, it can scarcely be supposed, were intended by Congress to be reduced to mere automata, while the officers of every other municipality are endowed with such a measure of discretion in the premises as may enable them to protect their fellow-citizens from such unreasonable demands, which may be made without regard for, and in opposition to the wishes and the good of the great majority.
This case has been the subject of careful examination, and, after full reflection, we are all of the opinion that it was within the competency of the Commissioners to pass such a regulation as that of the 29th December, 1866.
It remains to inquire whether the particular provisions of the regulation are “reasonable,” within the signification properly attached to that expression by the courts. It would not be sufficient, of course, that the members of the court might think that they themselves would not have voted for the measure, or that, in their judgment, it is not altogether wise. Within recognized limits, these questions are left for the decision of those who are empowered to make the regulations.
If a corporation should undertake to raise the license for a trader from three to five dollars, it would not be for a court to pronounce the ordinance an unreasonable one'; while if the corporation were to tax a man doing a business of a thousand dollars a year, to the amount of nine hundred dollars, a court might well say that was unreasonable. In *402 old. times, in this city, before there were such facilities for extinguishing fires as we have now, every citizen was required, under penalty, to keep fire buckets, made of leather, one for each story of his house. Suppose the corporation had required that each householder should keep five buckets for each story. The court would not have declared that to be an unreasonable regulation, under the duty of protecting the community against fire. But it undoubtedly would have pronounced it unreasonable for a corporation to ordain that a curfew should sound at nine o’clock, and every man should put out the lights and fires in his house ; although that would perhaps be the most effectual method possible to prevent fires.
We have been unable to discover anything in the regulation under examination unreasonable in the sense of the principle referred to. On the contrary, we consider it an eminently wise and proper provision.
All people know that, however carefully a theatrical performance may be conducted, it involves late hours; and considerable noise during the day and far into the night, frequently accompanied by the music of bands outside as a means of advertising; and that this must constitute a serious disturbance to the inmates of dwellings, to the young and' old, the well and the sick, in the immediate neighborhood. It is for these reasons that theaters almost always are located in parts of the city devoted rather to business jmrposes than to dwellings exclusively. It is also well known that such structures are considered a hazardous risk bf the insurance companies ; and when placed in a thickly built-up square, containing stables with their combustible contents, they may well constitute a source of apprehension.
It appears in this instance that the neighborhood is entirely devoted to dwellings; that tbe rink is opposite a church where services are held in- the week days as well as on Sunday; that combustible stables are numerous in the square; and that if such an establishment were to be located there, it would be in opposition to tbe sentiment of nearly, if not all, the neighboring citizens.
*403 ■ If no regulation existed of the character of that under examination, and the claim of an applicant must prevail over the remonstrances of every one else immediately interested, it would result that any adjacent proprietor who persisted in his demand must obtain a permit to erect such a theater, or a circus, or billiard saloon, or livery stable, or wood yard, next to any church, or hospital, or court room in the city; and this, although every voice might be opposed to it of the neighboring taxpayers, who may possess property a thousand times more valuable than the amount proposed to be invested.
It would be an extraordinary spectacle if the government of a great .city should be powerless to prevent the location of such an establishment as would work a serious impairment, if not the destruction of the-comfort of a large mass of its citizens who may have passed their lives in obedience to the law, at the mere demand of a single person who is indifferent to the injury he is thus inflicting upon others, for his personal advantage. For, after the theater had thus been allowed to be erected, the injured parties would be without any other chance of redress or remedy, except to hazard the difficult attempt, in the courts, to abate what would have become an established institution; incurring all the expense, abuse and obloquy usually accompanying such litigation where any are rash enough to undertake it.
The Supreme Court of the United States, in 108 U. S., 333, B. & P. R. R. Co. vs. Fifth Baptist Church, used this language in condemnation of a claim that a grant to a railroad company to construct a depot would authorize its establishment anywhere about the city, “ even in front of the President’s House or the Capitol, or in the most densely populated locality,” as Mr. Justice Field said. The court says:
“Whatever the extent of the authority conferred, it was accompanied with this implied qualification: that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others in their property. * * * The great *404 principle of the common law, which is equally the teaching of Christian morality, so to use one’s property as not to injure others, forbids any other application or use of the rights or powers conferred.”
For the reasons given, we are all of the opinion that this application should be overruled in whatever form it is presented, and it is so ordered.