# THE BALTIMORE AND OHIO RAILROAD CO.

*v.*

## THE DISTRICT OF COLUMBIA.

## BOWLER *v.* STOUTENBURGH.

# THE BALTIMORE AND POTOMAC RAILROAD CO.

*v.*

## THE DISTRICT OF COLUMBIA.

## KINDLE *v.* STOUTENBURGH.

STATUTORY CONSTRUCTION; POLICE REGULATIONS, REASONABLE-NESS OF; RAILROADS; VEHICLES; STREETS AND HIGHWAYS; DISCRETION; INJUNCTIONS; EQUITY JURISDICTION.

1. The reservation to Congress in the acts granting charters to certain railroad companies operating within the limits of the District of Columbia, of the right to enact such rules and regulations prescribing the speed of cars and other matters relating to the operation of such railroads as might be necessary for the security of the persons and property of residents of the District, is not an exclusive reservation of such power to Congress which precludes the municipal authorities from passing reasonable police regulations upon the same subject.

2. Railroad locomotives and cars are not within the meaning of the act of Congress of January 26, 1887, conferring upon the Commissioners of the District of Columbia power to regulate the movement of " vehicles" on the public streets and avenues of the city of Washington.

3. The joint resolution of Congress of February 26, 1892, authorizing the Commissioners of the District of Columbia to make and enforce all such reasonable and usual police regulations in addition to those already made under the act of January 26, 1887, as they might deem necessary for the protection of the lives, limbs, health, comfort and quiet of the persons and the

protection of all property within the District, gave the Commissioners power to make regulations governing the movement of railway locomotives and trains within the District.

4. Police regulations requiring steam railroad trains to be stopped before crossing other railroads operated by steam, cable and electricity, are not in themselves unreasonable.

5. While courts have the power to enquire into the reasonableness of municipal regulations that affect the free exercise of the ordinary rights of person and property when sought to be enforced, they will declare them invalid only in plain cases of usurpation of power or abuse of discretion.

6. Whether a police regulation governing the use of property situated or used in the public streets is reasonable or not will depend upon the special circumstances and exigencies of the situation to meet which the regulation may have been adopted; and although such regulation may be inconvenient, burdensome and oppressive, in a certain sense, it will not follow that by reason of such consequences alone it will be declared beyond the power and discretion of the legislative authority.

7. Where the question of the invasion of private right is one more of law than of fact, or where the facts are susceptible of reasonable and certain proof, courts may give slight weight to the judgment of municipal authorities; but where the case is one of practical fact unsettled by experience and resting in opinion, a court will hesitate to set up its judgment in opposition to that of the municipal officers, and will not declare a police regulation made under such circumstances unreasonable and invalid, before its operation has been given a fair test.

8. An injunction will not be granted against municipal authorities to enjoin them from enforcing certain police regulations governing the movement of locomotives and trains on the public streets of a city, upon the ground that obedience to one regulation will cause the violation of another, where the facts set forth in the record do not indicate with any degree of certainty that there would be an unavoidable conflict in the enforcement of the two regulations, and especially where the regulation directly involved in the case relates to the safety of life and property, while the one claimed to conflict with it relates merely to public convenience.

9. Whether a court of equity has jurisdiction to enjoin the enforcement of a police regulation through prosecutions duly carried on in a court of competent jurisdiction, where no attempt is made to enforce the same by the forcible invasion of or trespassing upon property, *quære.*

Nos. 596, 597, 598 and 600. Submitted January 8, 1897. Decided February 9, 1897.

HEARING on appeals from decrees dismissing bills in

equity to enjoin the enforcement of certain police regulations; and from judgments dismissing writs of *habeas corpus* and remanding the petitioners therefor to custody. *Affirmed.*

The COURT in its opinion stated the case as follows:

The same question, though presented in different ways, is involved in all the foregoing appeals, and they have, by agreement, been heard and considered together.

The question raised on behalf of the railway companies in each case is the validity of the following sections of the regulations adopted and ordered to be enforced by the Commissioners of the District of Columbia:

"Section 17. No locomotive, or train, with or without a locomotive attached, shall pass over any street railroad crossing, where the cars of a street railroad are propelled by cable or electric power, without coming to a full stop at a point not nearer than forty feet of the nearest rail of such crossing, and shall not pass over such crossing except in obedience to signal given by the gateman employed by the corporation owning the tracks over which such locomotive or train is to pass, and such signal shall not be given until the crossing gates are closed in such a manner as to effectually prevent access to said tracks from the highway.

"Section 18. The safety gates at every railroad crossing shall be closed during the passing of any trains, locomotives or cars, and shall be opened immediately after the passage of the same.

"Section 19. No train, locomotive or car shall be allowed to stop or stand on any street crossing for a longer period than two minutes at any one time."

Another section provides a fine for the violation of each of the foregoing sections, by any agent, employee, and so forth, of any railway company.

Francis T. Bowler, appellant in No. 597, and George R. Kindle, appellant in No. 600, were engineers of the Baltimore and Ohio Railroad Company, and the Baltimore and

10 Ct. App.—9

Potomac Railroad Company, respectively, and were arrested for, and tried and convicted in the Police Court, of violations of section 17 aforesaid. Refusing to pay the fines of five dollars each, they were duly committed to the District workhouse, of which the appellee, Walter H. Stoutenburgh, is intendant, for the period of fifteen days. Writs of *habeas corpus* were at once sued out in the Supreme Court of the District; but in each case the writ was dismissed and the petitioner remanded to the custody of the intendant aforesaid.

Each of the railroad companies had previously filed a separate bill in equity against the Commissioners to restrain the enforcement of said regulations. Restraining orders were granted, and the Commissioners were ordered to show cause why an injunction should not be granted. The Commissioners answered under oath, and the cases were, by stipulation, " set down for hearing upon the bills, answers, exhibits and accompanying affidavits." The bills were, upon this hearing, dismissed, and the appeals taken thereon are those numbered 596 and 598 above.

The *habeas corpus* records contain no statements of facts; but it has been agreed on all sides that for their determination also we shall look to the records of the other cases.

It appears from the allegations of the bills that an immense number of passenger and freight trains traverse the streets of Washington daily on each railroad, carrying many passengers, and much mail, express and freight to and fro, in course of transportation from State to State.

Each railroad is operated under charters from the State of Maryland, and in accordance with acts of Congress. These acts, respecting each company, contain a clause, upon which the appellants rely in part, reserving to Congress the right " to enact such rules and regulations prescribing the speed of cars or carriages passing over said road and other matters relating thereto necessary for the security of the

persons and property of the inhabitants of the District of Columbia in such manner as the present or any future Congress shall deem expedient."

The Baltimore and Ohio tracks are crossed by one cable railway and the Baltimore and Potomac tracks by one cable and one electric railway, within the limits of Washington and near their respective stations. The said cable and electric railways were constructed since the said steam railways occupied the streets under the power granted them by Congress.

The bills allege that each railway crossing is supplied with safety gates, electric alarm bells and gate keepers, and that every reasonable precaution has been taken to insure safety.

Appellants first charge that the District Commissioners have no power to enact any such regulations at all. They further say that the said regulations are unreasonable and oppressive, because they will cause ruinous delays in the transportation of passengers, mails and interstate commerce; that by reason of heavy grades, curves, and so forth, at and near crossings, the ordinary trains cannot be stopped and started in the time required, and hence by reason of the trains lying across more than one street at a time, they will be subjected to penalties for obstructing crossings as provided in section 19 aforesaid. They say that all the dangers that are supposed to be avoided by the regulations are fully guarded against by the gates, watchmen, and alarm bells already provided and maintained. They also charge defendants with the intent to use physical force to stop said trains, as well as to institute constant criminal prosecutions against the employees of complainants, all of which, they say, will lead to much unnecessary, vexatious and expensive litigation.

Affidavits accompany the bills showing the condition of the tracks, crossings, and so forth.

The following affidavit on behalf of the Baltimore and

Potomac Company fairly presents the condition attending its operation in the city:

"Francis P. Holmes, being first duly sworn, on his oath deposes and says as follows: That he is in the employ of the Baltimore and Potomac Railroad Company, in the capacity of train dispatcher, and has been in such employ for about five years; that he has personal knowledge of the extent and character of the freight and passenger traffic of said railroad, and is familiar with the movement and management of its trains in the District of Columbia; that about thirty trains daily now leave the passenger depot of said railroad company at the corner of Sixth and B streets northwest, and pass up Sixth street to Virginia avenue, and along said avenue and various streets to the east on their way north; and about an equal number of passenger trains leave said depot going south on Maryland avenue, to and over the Long Bridge, into Virginia; that about the same number of trains daily enter said station from the north and south over the same route as depart therefrom; and in addition to the regular passenger trains daily entering and departing from said station there are a large number of through trains for points in the west and south which are made up in Jersey City, New Jersey, which pass through the city of Washington by way of and over Virginia and Maryland avenues and said crossings at Four-and-a-half and Seventh street, and thence over the Long Bridge into Virginia; that in addition to the passenger trains aforesaid from ten to fourteen regular freight trains (exclusive of passenger and freight shifting engines), containing from twenty-five to thirty loaded cars, daily pass along the streets between the Long Bridge and Eastern branch of the Potomac; that said freight trains coming from the south, on their way to various points in the north, pass from the Long Bridge down Maryland avenue to its junction with Virginia avenue, thence along Virginia avenue to Canal street, and to and over the trestle bridge crossing the Eastern branch of the Potomac; that heavy freight trains of loaded

cars also daily pass over the said route on their way south; that in addition to the freight and passenger trains of the plaintiff the trains of the Southern Railroad Company, the Chesapeake and Ohio Railroad Company, the Washington and Southern Railroad Company, for various points in the south and west, daily pass over the plaintiff's lines of railroad between its passenger station aforesaid and the Long Bridge; that if these various trains are compelled to stop before crossing Four-and-a-half and Seventh streets it will seriously interfere with and interrupt the business of the plaintiff and obstruct travel upon the streets east and west of said Four-and-a-half and Seventh streets from three to five minutes at a time, according to the condition of the weather and the length and character of the train; that if trains going south are compelled to stop on Maryland avenue before crossing Seventh street they will 'stall,' owing to the heavy grade at that point, and cause an additional delay of from five to eight minutes in order to get them started."

An affidavit substantially similar in respect of the number and length of trains and difficulties of stopping, and so forth, was filed on behalf of the Baltimore and Ohio Railroad Company, and in addition a curve in the tracks near their intersection with the Columbia cable railway was described as greatly increasing the difficulties of stopping and starting ordinary trains.

The answers of the Commissioners under oath alleged, among other things justifying the regulations, that the very great number of the steam railway trains crossing streets at grade at all times of the day and night greatly increased the dangers to life and property of citizens who cross the said track in great numbers at all hours of the day; that the electric and cable lines cross the complainants' tracks at intervals of about three minutes, carrying great numbers of passengers; that " in the last few years by the use of cable and electric power instead of horse cars in the transportation of passengers in the city of Washington difficulties and

dangers have arisen, growing out of the intersection of such lines with each other and with the lines of steam railways, which, in the opinion of these defendants, were not sufficiently guarded against by previous regulations. So far as these difficulties and dangers growing out of the intersection of such cable and electric lines with each other these defendants have undertaken to provide against them by a regulation adopted on the twenty-sixth day of October, 1895, a copy of which is hereto appended, marked ' Exhibit B,' and made part hereof.

"Afterward, in various ways, the dangers to life and property arising from the intersection of such cable and electric lines with the lines of steam railways within the city of Washington were brought to the attention of the defendants. They investigated the matter with great care and reached the conclusion that the safety gates and gatemen referred to in the bill of complaint in this case are not sufficient safeguard for such crossings. These defendants, upon information and belief, aver that both upon such cable lines and upon such electric lines there are a variety of circumstances under which a car propelled by cable or electric power, as the case may be, may at any point in its course be brought to a stop suddenly, unexpectedly, and under such circumstances that if such stoppage should occur while the car is crossing the line of a steam railway it would be impossible for those in charge of such car in any way to get it out of the way of an approaching train.

" That no freight or other train should be drawn which stretches from one square to another square; that it is a nuisance for trains to be made up of thirty to forty cars, extending from a quarter to a third of a mile in length, and that said plaintiff ought of its own motion and a due regard for the rights of the public to break up said trains to short and reasonable limits while passing through Washington City."

That after careful consideration of the difficulties and dangers of the situation, they became satisfied that the ex-

isting regulations in respect of speed of trains, safety gates, alarm bells, watchmen, &c., were not sufficient for the proper protection of lives and property, and therefore, in the discharge of the duty committed to them, the aforesaid regulations were made and ordered enforced.

The Commissioners further expressly deny the unreasonableness of the regulations, and say that they can be easily and readily complied with without serious injury or embarrassment to complainants in the performance of their public duties as common carriers. They aver that similar regulations are in force in many of the States of the Union.

The allegations of the Commissioners are supported in some particulars by affidavits; and in respect of the Baltimore and Ohio crossing of the Columbia cable railway, some instances of dangers actually encountered are given, tending to show the necessity for additional regulations for safety in the line of those here complained of.

They also deny any intention to use physical force to compel the complainants' trains to stop; but submit they do intend to enforce the regulations by criminal prosecution whenever violated, in the Police Court of the District. They further say that said court has complete jurisdiction in the premises, and that every question raised by the bills of complaint can be decided therein in due course of law; wherefore complainants have a plain, adequate and complete remedy at law, without appealing to the jurisdiction of a court of equity.

*Mr. Geo. E. Hamilton, Mr. M. J. Colbert* and *Mr. Enoch Totten* for the appellants:

1. Section 17, article 10, of the police regulations is illegal and void. By act of March 2; 1831, Congress expressly reserved to itself the power attempted here to be exercised over the railroad companies by the Commissioners, and a like reservation is contained in the act of Congress authorizing the extension of the lines of the Baltimore and

Potomac Railroad Company into the District of Columbia. Act of February 5, 1867, 14 Stat. 389.

The power thus reserved has never been delegated by Congress to the Commissioners of the District of Columbia. If any such delegation or grant of power has been made it is contained either in section 10 of act of January 26, 1887, or in section 2 of the "joint resolution to regulate licenses to proprietors of theaters in the city of Washington, District of Columbia, and for other purposes;" but an examination will clearly show that no such delegation or grant is contained either in said act or resolution.   The tenth section of the act of January 26, 1887, authorizes the Commissioners "to regulate the movements of vehicles on the public streets and avenues for the preservation of the order and protection of life and limb."   If to the word vehicle the "ordinary and usual sense" is given, it will not include railroad cars, which only run on a permanent, continuous and connected track.   Their course is fixed and determined and cannot be altered except by Congressional act.   Their very construction and use in the carriage of United States mail and other public matters of importance precludes the possibility that Congress intended to include them in the terms and scope of the tenth section of said act.   *Bridge Co.* v. *Railroad Co.*, 114 Pa. St. 484; *Duckwall* v. *New Albany*, 25 Ind. 286; 48 Fed. Reporter, 348; *Whitaker* v. *Railroad Co.*, 51 N. Y. 295.

But the right to regulate the movement of steam cars does not carry with it the right to "stop" steam cars; so that if the meaning of "vehicles" is so enlarged as to include such cars, the section relied on does not give the Commissioners the right to stop said cars.   If it is the right of the Commissioners to stop the steam cars for a few moments, it is their right to stop them for a longer time. If it is the right of the Commissioners to stop them at one street crossing, it is their right to stop them at every street crossing traversed.   If Congress had intended to grant to the

Commissioners so important a power it would have done so in positive and specific terms, and would not have left it to be inferred from section 10, which clearly has reference only to to the ordinary vehicles which traverse the streets at will, and need, because of their irregular courses, municipal control.

The fact that these railroad companies are both carriers of United States mails is a very conclusive reason why Congress should reserve to itself the power to control and regulate their operation and movements; and a still stronger reason for this reservation by Congress is to be found in the fact that these roads are the media of interstate commerce, the regulation of which by constitutional provision is delegated to Congress, and Congress, by its several enactments, has prohibited any interference with its control over the subject of commerce among the several States.

2. If Congress has conferred upon the Commissioners the power to regulate the movement of steam cars on and over the streets of Washington, the attempted exercise of this power in and through the amended regulations referred to is such an unreasonable exercise of the power conferred as to make said regulations void and impossible of enforcement. *Mayor* v. *Scharf*, 54 Md. 499 ; *Mayor* v. *Radicke*, 49 Md. 219.

3. Can the attempted enforcement of a void municipal ordinance be restrained or enjoined by a court of equity at the instance of a party whose property interests and property rights would be injuriously affected by its enforcement? This question has been the subject of judicial determination in both Federal and State courts, and the current of authority will be found to sustain the power and jurisdiction of courts of equity to restrain the enforcement of void municipal ordinances at the suit of any party whose property rights and interests are injuriously affected. This jurisdiction of the courts of equity has been repeatedly questioned and as often affirmed by the decisions of the Court of Appeals of Maryland. *Page's Case*, 34 Md. 564; *Mayor* v. *Radicke*,

49 Md. 219; *Mayor* v. *Scharf*, 54 Md. 499; *Deems* v. *Mayor*, 80 Md. 164.

The same rule has been declared by the courts of other States. *Davis* v. *Fasig*, 27 N. E. Rep. 727; *Rushville* v. *Gas Co.*, 28 N. E. Rep. 853.

4. The unreasonable exercise by a municipal corporation of power conferred upon it will invalidate its act and give to a court of equity power and jurisdiction to restrain. *Mayor, &c.* v. *Scharf, supra*; *Mayor, &c.* v. *Radicke, supra*; Dillon on Municipal Corporations, Sec. 262.

The question of the power of an equity court to restrain an ordinance similar in authority and character to the one here complained of was before the late Chief Justice Waite, in *Railroad Co.* v. *West Grafton*, which was heard in the United States Circuit Court for the District of West Virginia. In this case the bill was filed to enjoin the town from carrying the ordinance into effect, on the ground that it was inoperative and void, because unreasonable and not authorized by law. On hearing upon bill, answer and affidavits a decree was entered making the temporary injunction perpetual.

And while this court has not directly passed upon the jurisdiction of the court of equity to restrain the Commissioners in the enforcement of a void ordinance, when the enforcement of such an ordinance or regulation would injuriously affect vested interests, it did, however, in the recent case of *U. S. ex rel. Deffer* v. *Kimball*, 7 App. D. C. 499, assert that a court of equity was the appropriate tribunal to resort to under such circumstances.

*Mr. S. T. Thomas*, attorney for the District of Columbia, *Mr. A. B. Duvall*, assistant attorney, *Mr. Nathaniel Wilson* and *Mr. A. S. Worthington* for the appellees:

1. The Commissioners had power to make the regulations in question. The act of February 21, 1871 (16 Stat. 426), gave to the Board of Public Works thereby created

"entire control of the streets, avenues," etc., of the city.
The act of June 11, 1878 (20 Stat. 103), confers upon the
Commissioners the powers formerly possessed by the Governor and Board of Public Works. The so-called "reservation" in the acts authorizing the entry of the appellant
railroad companies into the District of Columbia did
not in any way change or enlarge the rights of the railroad
companies or abridge the police powers of the municipality.

The act of January 26, 1887 (24 Stat. 368), authorized
and empowered the Commissioners to make, modify, and
enforce usual and reasonable police regulations in and for
said District; "to regulate the movements of vehicles on
the public streets and avenues, for the preservation of order,
and protection of life and limb." The word vehicle is
employed in the statute in its usual and ordinary sense, and
means "that which is used as an instrument of conveyance,
transmission, or communication." The Century Dictionary,
1891.

Trains and locomotives are certainly vehicles within this
definition and within the meaning of the term as ordinarily
understood. There is nothing in any of the provisions of
the act which forbids this reasonable and material construction of an unambiguous word. *State* v. *Collins*, 16 R. I. 371;
*Memphis* v. *Batterlie*, 8 Heiskell (Tenn.), 537; *St. Louis* v.
*Woodruff*, 71 Mo. 93.

2. The regulations in question are not so manifestly unreasonable and oppressive as to justify the court in holding
them void for that reason. The leading case in this jurisdiction upon this subject and one that appears to us to be
decisive in favor of the appellees in these cases is *Railroad
Co.* v. *Richmond*, 96 U. S. 521. There was considered in that
case a regulation of the common council of the city of Richmond prohibiting a railroad company which, by authority
of the legislature of Virginia, had built a railroad into the
city of Richmond, from using steam power on a portion of
their road within that city. The court held that the rail-

road occupied the streets of Richmond subject to reasonable regulation in the use thereof by the city authorities; and, that prohibiting the use of steam power in the city was a valid exercise of the police power. Almost equally persuasive in this connection is the case of *Hayes* v. *Railroad Co.*, 107 U. S. 228, in which case the court sustained a regulation which required a railroad company to erect a fence between its tracks and a public park which bordered on the street occupied by the railroad. Generally, as to the exercise by municipal corporations of the police power for the preservation of the lives and health of its citizens, see the *Slaughter Houses Cases*, 16 Wall. 36 : 111 U. S. 746.

In *Buffalo, etc., R. Co.* v. *City of Buffalo*, 5 Hill, 289, it was expressly decided that the authority to regulate the running of trains gave the city the right to prohibit the use of steam power in the city. See also *Whitson* v. *Franklin*, 34 Ind. 392; *Knobloch* v. *Railroad Co.*, 31 Minn. 402; *Railroad Co.* v. *Jersey City*, 47 N. J. L. 286; *Railroad Co.* v. *East Orange*, 41 N. J. L. 130.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first point of appellants' contention is, that the Commissioners are wholly without the power to make police regulations affecting their respective railways because Congress, in the acts permitting them to enter the District of Columbia, expressly reserved that power to itself to be exercised by direct action. This is founded in the clause contained in each of said acts, reserving " the right to enact such rules and regulations prescribing the speed of cars or carriages passing over said road, and any other matters relating thereto necessary for the security of the persons and property of the inhabitants of the District, in such manner as the present or any future Congress shall deem expedient."

The ordinary power of police regulations of the exercise, by the grantees, of the franchises conferred, required no reservation to preserve its existence; nor could it have been

surrendered or contracted away by the express grant, even, of one Congress so as to bind its successors. The foregoing provision, however, contains no element of a grant or contract; it is a reservation, wholly unnecessary, that seems to have been inserted out of abundant caution merely, and for no other purpose. We find nothing in its language expressive of an intent to reserve the exercise of such power to Congress by direct act exclusively, or to preclude its delegation. by reasonable implication, to the ordinary municipal authorities of the District.

2. The question next occurring is, whether Congress has delegated this power to the Commissioners to the extent exercised by them in the adoption of the regulations aforesaid, and particularly of section 17 thereof?

Though differing in many important. respects from the ordinary municipal governments in existence thoughout the country, the local government of the District of Columbia is nothing less than a municipal corporation. *Metropolitan R. Co.* v. *District of Columbia,* 132 U. S. 1, 7 ; *Eckloff* v. *District of Columbia,* 135 U. S. 240, 243.

The Commissioners are the governing body, with duties chiefly executive; but they may and do exercise certain powers of local legislation or municipal regulation under the direction of Congress. The subject-matter of these regulations and the manner of their enforcement are either indicated in, or to be necessarily implied from, express delegations of authority.

An act of Congress, approved January 26, 1887, conferring upon the Commissioners the power to make certain police regulations, contained the following, among other clauses, in section 10 : "To regulate the movement of vehicles on the public streets and avenues for the preservation of order and the protection of life and limb." 24 Stat. 368.

We agree with the appellants that railroad locomotives and cars are not within the meaning of the word "vehicles" as used in the foregoing clause. They may, no doubt, be

regarded as vehicles in a strained sense, and therefore held to be comprehended in the word when such an intention can be reasonably gathered from the context; but they are not within its usual and ordinary signification.

We are clearly of the opinion, however, that the power to regulate the movements of railway locomotives and trains was conferred upon the Commissioners by the joint resolution of Congress, approved February 26, 1892, which reads as follows: " That the Commissioners of the District of Columbia are hereby authorized and empowered to make and enforce all such reasonable and usual police regulations, in addition to those already made under the act of January 26, 1887, as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia." 27 Stat. 394.

The contention on behalf of the appellants, that this resolution confers no new powers not authorized by the former act, and must be limited by construction to such other and further regulations only as may be of the class enumerated therein, is without foundation.

The resolution is so general, and so comprehensive in its terms, that had it been incorporated into the act of 1887, as the concluding clause of section 10, its operation could hardly be limited by the scope of the specific grants of power preceding it. But, enacted after five years of experience under the old law and in express addition to the powers therein conferred, we think it clear that Congress intended thereby to increase the powers of the Commissioners to the full extent of those frequently, if not generally, entrusted to municipal corporations. Upon no other theory can its passage be reasonably accounted for. And instead of entering into details, as in the former act, the grant of the power to make *usual* and *reasonable* police regulations was expressed in the broadest terms.

3. That regulations requiring steam railroad trains to be

stopped before crossing other railroads operated by steam, cable and electricity, are usual in other cities of the country, is positively averred in the answers of the Commissioners, and must be accepted as true. Such regulations have certainly been made and enforced in other jurisdictions in respect of the crossing of one steam railroad by another at grade, and in country as well as in cities, and their reasonableness has, so far as we have been able to discover, always been upheld. *L. S. & C. R. Co.* v. *C. S. & C. R. Co.*, 30 Ohio St. 604, 617; *M. & O. R. Co.* v. *The People*, 29 Ill. App. 428; *State* v. *Noyes*, 47 Me. 189, 201.

4. Whilst the courts have the undoubted power to inquire into the reasonableness of municipal regulations that affect the free exercise of the ordinary rights of persons and property, when sought to be enforced, they will not declare them invalid save in plain cases of usurpation of power or of abuse of discretion.

The use of all property, more especially that situated or used in the public streets, is subject to the exercise of the power of reasonable police supervision and regulation, for the protection of the public health and safety. And what may, and what may not, be a reasonable requirement in one case, cannot be determined by a fixed rule applicable alike to all; but must, of necessity, depend upon special circumstances and the exigencies of the situation, to meet which the regulation may have been adopted. Every such regulation may be, and often is, inconvenient, burdensome and oppressive in a certain sense; but it does not follow that, by reason of such consequences alone, it must be declared beyond the power and discretion of the legislative authority. To compel the appellants to stop their trains at the crossings, as required by the regulation in question, will cause them inconvenience, and, no doubt, work irksome delays in the passage of their trains through the city of Washington; but these requirements do not appear to be so oppressive, necessarily, as to require them to be declared

unreasonable when considered in connection with the paramount duty with which the Commissioners are charged in respect of the protection of the lives and property of the people who are also entitled to the use of the streets, subject only to similar restrictions. Regulations apparently far more burdensome than this—for example, compelling steam railway companies to substitute horse power for steam, within certain limits—have been declared by the Supreme Court of the United States not to be unreasonable or in violation of private right. *Railroad Co.* v. *Richmond,* 96 U. S. 209.

· In a recent case in that court, in which a State police regulation was assailed by a railway company engaged in interstate commerce, it was said : "The well settled rule is, that if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge." *Hennington* v. *Georgia,* 163 U. S. 299, 303, 304.

And it follows, necessarily, that unless these conditions *are* palpable, the courts cannot so adjudge.

Now, in a case where the question of the invasion of private rights is one more of law than fact, or where the facts are susceptible of reasonably certain proof, courts may give slight weight to the judgments of the municipal authorities, and presume little in their support beyond good intentions and integrity of action in the premises. But in a case like the present, where the question is one of practical fact, unsettled by experience, and resting in opinion, a court should surely hesitate to set up its judgment in opposition to that of the municipal officers, who, by virtue of their training, observation and experience in the performance of their duties, ought to be well informed and capable of arriving at satisfactory conclusions in such matters.

Had the appellants undertaken to obey the regulation, in

good faith, and to give its operation a fair test before engaging in litigation to prevent its enforcement, we might have had abundant evidence before us by which the question of its reasonableness, under all the surrounding circumstances, could readily be determined. As it is, however, we have no satisfactory proof that would justify us in overruling the action of the Commissioners in the course of a duty imposed upon them and entrusted to their special discretion, and in the discharge of which they must be presumed to be actuated by the only motive that should control the conduct of public officers.

5. There are some affidavits accompanying the bills which tend to show that at certain crossings where stops are compelled to be made, long trains that may cover two street crossings at the same time cannot be stopped, under constantly occurring conditions, as required in section 17, and started again within the limit of two minutes beyond which, as provided in section 19, cars cannot be allowed to stop on any street crossing. On this foundation, the argument is made that section 17 must be declared unreasonable because obedience to its requirements will necessarily cause the violation of section 19. The Commissioners, in their answer, say that this difficulty (which they do not admit the probability of) may be readily obviated by dividing up and thus shortening the trains so as to prevent their covering more than one crossing at the same time. As regards this, however, we are not prepared to say, from the facts before us, that the suggested remedy would or would not prove unreasonably burdensome and oppressive.

As it is not certain that there will be this inevitable conflict in the enforcement of the two sections, the objection to section 17, founded thereon, cannot be regarded as well taken. Moreover, section 17 is the leading and important one of the series of regulations, and has relation to the safety of life and property, while section 19 relates merely to the public convenience in the use of the streets. Section 17 is the one

10 Ct. App.—10

directly involved in this case, for under it the prosecutions have been maintained; and the consideration of section 19 is incidental merely.

If the alleged conflict in the operation of the two sections were conceded, it would not necessarily follow that both regulations should at once be declared unreasonable and invalid. Upon its becoming manifest, the Commissioners would, no doubt, immediately make the necessary changes in section 19 to accommodate it to the other. Nor can we assume that, in a prosecution in the Police Court for the violation of section 19, that court would fail to hold it a complete defence if it should be made to appear that the said violation was the necessary result, under prevailing natural conditions, of obedience to the commands of section 17.

6. The records of the cases of Bowler and Kindle contain no facts, and in accordance with the stipulation of counsel, the records in the equity cases of the two railway companies have been resorted to for the facts necessary to the determination of the validity of the seventeenth section of the regulations, which alone is involved in the two first cases. From the bills, answers, and affidavits in the last two cases, the preliminary statement and the facts adverted to in the opinion have been taken, and it is therein that regulations other than section 17 aforesaid have been brought to our attention.

Considered in the light of these facts, we have found no error in the judgments below remanding the appellants, Bowler and Kindle, to the custody to which they were committed in default of the payment of the fines imposed upon them for the violation of the regulation, section 17, and they must each be affirmed, with costs.

The only question presented in the equity appeals that is not involved in the other cases, is one of jurisdiction, and the decision of that is now wholly unnecessary, because, whatever view might be taken of it, the decrees dismissing the bills must necessarily be affirmed. Leaving open, there-

fore, the important question whether a court of equity has jurisdiction to enjoin the enforcement of a police regulation through prosecutions duly carried on in a court of competent jurisdiction, and where no attempt is made to enforce the same by the forcible invasion of or trespass upon property, the decrees appealed from by the Baltimore and Ohio Railroad Company and the Baltimore and Potomac Railroad Company, respectively, must be affirmed, with costs; and it is so ordered.                          *Affirmed.*