Joseph FILIPPO, Petitioner,

v.

**REAL ESTATE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent.**

No. 3850.

District of Columbia Court of Appeals.

Argued June 20, 1966.

Decided Oct. 19, 1966.

James C. Cawood, Jr., Washington, D. C., for petitioner.

Richard W. Barton, Asst. Corp. Counsel, with whom Milton D. Korman, Acting Corp. Counsel, and Hubert B. Pair, Acting Principal Asst. Corp. Counsel, were on the brief, for respondent.

Before QUINN and MYERS, Associate Judges, and CAYTON (Chief Judge, Retired).

CAYTON, Judge:

A real estate broker has brought here for review an order of the District of Columbia Real Estate Commission suspending his license for 45 days. He was charged with a "continued and flagrant course of misrepresentation" and "unworthiness" to act as a real estate broker, D.C.Code, § 45–1408 (c) (h) (1961). The essence of the charges was that petitioner participated in and consented to a course of conduct by two licensed real estate salesmen in his employment which constituted a violation of the District of Columbia Police Regulations, Art. 45, § 3(a) (December 31, 1963). Those regulations prohibit any person, for reasons of race, color, religion or national origin, to:

> Refuse or fail to transfer an interest in real property, or require different terms for such tansfer, or falsely represent that such interest is not available for such transfer.

The charged violation consisted essentially of exhibiting and offering for sale a house, listed with petitioner, to Negroes at a higher price than the same house was exhibited and offered for sale to white persons.

Petitioner argues that the Real Estate Commission erred as a matter of law in finding that he acquiesced in the acts of discrimination, and that the Commission's findings are not supported by the evidence. He further contends that there is no evidence to support the finding that the salesmen discriminated against any persons on account of race;[1] also that if the salesmen did commit any violations, the Commission erred in holding petitioner responsible under the doctrine of respondeat superior for those violations.

Because the Commission found that petitioner had personally participated in conduct which constituted a violation of the Fair Housing Regulations, we find it unnecessary to consider the applicability of respondeat superior. The Commission found: (1) that petitioner refused to accept from a Negro a purchase offer of $22,500, the price quoted to the Negro by petitioner's salesman, and told the Negro that the selling price was $26,950, and (2) that, subsequently, petitioner acquiesced in

---

1. The license of each of the salesmen was also suspended for 45 days, and they did not seek appellate review.

the acceptance of a purchase offer of $22,500 from a white person for the same house. Our study of the transcript satisfies us that these findings are supported by the evidence. Independent of the other charges they are a sufficient basis for the action taken by the Commission.

Finally petitioner contends that the Commission erred in applying the Fair Housing Regulations because (1) the District of Columbia Commissioners did not have the power to promulgate those regulations or (2) that if they did have such power, the delegation of such authority to them was an unconstitutional delegation of the legislative authority of Congress. In considering these latter arguments it will be helpful to examine the legislative basis of the District of Columbia Government.

Between 1800, when the United States took possession of the District of Columbia, and 1871, the government of the District was "strictly municipal in its character." Metropolitan R.R. v. District of Columbia, 132 U.S. 1, 5, 10 S.Ct. 19, 33 L.Ed. 231 (1889). In 1871 the Legislative Assembly was established and the District was constituted "a body corporate for municipal purposes," with power to make contracts, sue and be sued, and to "exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States * * *." 16 Stat. 419 (1871). A governor and a board of public works were also provided for. In 1874 the Legislative Assembly was abolished, and the President was authorized to appoint three commissioners to exercise the power and authority formerly vested in the governor and the board of public works. 18 Stat. 116 (1874). The present Organic Act for the District was passed in 1878 and provides that the District shall "remain and continue a municipal corporation," as provided in 1871, with appointed commissioners exercising powers similar to those given the commissioners in 1874. 20 Stat. 102 (1878).

█ Under this form of government the Congress exercises sovereign power over the District of Columbia, Neild v. District of Columbia, 71 App.D.C. 306, 110 F.2d 246 (1940), and determines for itself how and to whom authority to make police regulations is delegated. Frend v. United States, 69 App.D.C. 281, 100 F.2d 691 (1938). Accordingly, in 1887 Congress passed an act authorizing the Commissioners of the District to "make, modify, and enforce usual and reasonable police regulations" covering ten enumerated subjects. 24 Stat. 368 (1887). And in 1892 a Congressional Joint Resolution authorized the Commissioners:

> To make and enforce all such reasonable and usual police regulations in addition to those already made under the act of [1887] as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia. 27 Stat. 394 (1892).

There are numerous other enabling clauses which give the Commissioners authority to make regulations to carry out specified congressional legislation.[2] E.g., D.C.Code, § 45–1403 (1961). Petitioner's constitutional attack challenges the Joint Resolution of 1892.

I

█ The Supreme Court has settled beyond question that "the Commissioners by the Joint Resolution of February 26, 1892, 27 Stat. 394, were vested with local legislative power as respects 'reasonable and usual police regulations.'" District of Columbia v. John R. Thompson Co., 346 U.S. 100, 111, 73 S.Ct. 1007, 1013, 97 L.Ed. 1480 (1953). There it was said:

> The power of Congress over the District of Columbia relates not only to "na-

2. See Schmeckebier, The District of Columbia: Its Government and Administration 146 (1928).

tional power" but to "all the powers of legislation which may be exercised by a state in dealing with its affairs." 346 U.S. at 108, 73 S.Ct. at 1011.

[T]here is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power, subject of course to constitutional limitations to which all law making is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted. 346 U.S. at 109, 73 S.Ct. at 1012.

■ The Supreme Court was there considering the power of the old Legislative Assembly to enact antidiscrimination laws for restaurants. But the same broad principle is applicable to the delegation of this kind of local legislative power to the Commissioners. The contention that Congress could not vest legislative power in the Commissioners to make police regulations of a local nature was rejected in La Forest v. Board of Commissioners, 67 App.D.C. 396, 92 F.2d 547, cert. denied 302 U.S. 760, 58 S.Ct. 367, 82 L.Ed. 588 (1937). Accord, Jones v. District of Columbia, 116 U.S.App. D.C. 301, 323 F.2d 306 (1963). Elsewhere, local legislative power is commonly delegated to boards of commissioners of municipal corporations. 4 McQuillin, Municipal Corporations § 13.03, n. 20 (3d ed. 1949). The Supreme Court has said:

> We do not suppose that it is necessary to a municipal government, or to municipal responsibility, that the officers should be elected by the people. Local self-government is undoubtedly desirable * * *. [but] Commissioners are not infrequently appointed * * *. Metropolitan R.R., supra, 132 U.S. at 8, 10 S.Ct. at 22.

We think it must be held that there was no inherent constitutional barrier to the delegation of this regulatory power to the Commissioners. The next question is whether the Commissioners were in fact empowered to promulgate those regulations.

II

The Supreme Court ruled in *Thompson* that the power of the Commissioners under the Joint Resolution of 1892 could have been exercised to supplant the antidiscrimination acts of the Legislative Assembly with new and different ordinances. *Thompson,* supra, 346 U.S. at 111, 73 S.Ct. 1007. Petitioner, however, contends that the scope of police regulations promulgated under such a power is limited to public facilities such as streets and sidewalks, or to conditions which tend to cause injury to persons or property either by direct physical injury or by the creation of a nuisance. Petitioner cites no authority for this contention, and we are of course aware of the concurrent but not equal powers of the Congress and the District Commissioners to make police regulations.[3]

■ As a basic proposition, Congress has the sole and plenary power to legislate for the District of Columbia. Neild v. District of Columbia, supra. The police power of Congress with respect to the District is the same as that of state legislatures within their jurisdictions. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); Lansburgh v. District of Columbia, 11 App. D.C. 512, 521 (1897). See also Nebbia v. People of State of New York, 291 U.S. 502, 523–529, 54 S.Ct. 505, 78 L.Ed. 940 (1934). The Commissioners possess only delegated authority rather than inherent legislative power. United States ex rel. Daly v. MacFarland, 28 App.D.C. 552, 558 (1907); Savage v. District of Columbia, D.C.Mun.App., 54 A.2d 562 (1947). But that delegated power is extensive.

In construing the Commissioners' local legislative power the court in Siddons v. Edmonston, 42 App.D.C. 459, 464 (1914), discussed the conjunction of the Act of 1887 and the Joint Resolution of 1892:

> It * * * appears that Congress became convinced that its previous grants

---

3. See generally, 27 C.J.S. District of Columbia §§ 2–3 (1959).

of police power to the commissioners were inadequate, and that the interests and welfare of the people of the District required that the commissioners, who presumably were in closer touch with local conditions than Congress, should be clothed with power to enact all reasonable and usual police regulations that they might deem necessary.

\* \* \*

If Congress did not intend that the Joint Resolution should broaden the delegation of authority to the Commissioners, it would be mere surplusage. That such is not the case is evidenced by the language reciting the congressional intent to give the Commissioners the power to make reasonable and usual police regulations "in addition to those already made under the act of [1887]." 27 Stat. 394 (1892). This was made manifest in Baltimore & O. R.R. v. District of Columbia, 10 App.D.C. 111, 126 (1897), where it was clearly stated that "Congress intended thereby to increase the powers of the Commissioners to the full extent of those frequently, if not generally, entrusted to municipal corporations." That increase in power in no way diluted or affected the sovereignty of Congress, for the subject matter of the police regulations and the manner of their enforcement are either indicated in or necessarily implied from the express delegation in the Joint Resolution. See Baltimore & O. R.R., supra, 10 App. D.C. at 125. See generally, 5 McQuillin, Municipal Corporations §§ 16.05.06 (3d ed. 1949). In an analogous situation the power to promulgate building regulations for the District of Columbia has been necessarily implied from an express delegation to the Commissioners to make and enforce "such building regulations for the \* \* \*

District as they may deem advisable." 20 Stat. 131 (1878); United States ex rel. Strasburger v. Commissioners, 16 D.C. 389, 5 Mackey 389 (1887); see Smithson v. District of Columbia, 42 App.D.C. 184 (1914); United States ex rel. Smithson v. Ashford, 29 App.D.C. 350 (1907).

It may be conceded that the District of Columbia is not in all respects a typical municipal corporation.[4] Thus, certain municipal functions are performed by purely federal agencies. For example, the United States Treasury controls the financial transactions of the District.[5] This unique character is reflected in court decisions which prohibit the Commissioners from imposing duties or levying taxes without specific authority from Congress. Newman v. Willard's Hotel Co., 47 App.D.C. 323 (1918); see Coughlin v. District of Columbia, 25 App.D.C. 251, 254 (1905).

█ And there is no doubt that congressional legislation on a particular subject can preclude regulation of that subject by the Commissioners. Coughlin v. District of Columbia, supra, at 255; accord, Lee v. District of Columbia, 25 App.D.C. 388 (1905); District of Columbia v. Libbey, 9 App.D.C. 321, 329–330 (1896); see Baltimore & O. R.R. v. Fitzgerald, 35 App.D.C. 116 (1910). Compare French v. District of Columbia, 32 App.D.C. 106 (1908). But absent such unique limitations or congressional "occupation of the field," [6] the Commissioners in exercising their local legislative power may promulgate reasonable and usual police regulations. Taylor v. District of Columbia, 24 App.D.C. 392, 401, 404 (1904); Baltimore & O. R.R., supra, 10 App.D.C. at 124–28; see Thompson, supra, 346 U.S. at 111, 73 S.Ct. 1007.

---

4. See generally, Derthick, Report: City Politics in Washington, D. C. 40–42 (published by the Joint Center for Urban Studies of the Massachusetts Institute of Technology and Harvard University and by the Washington Center for Urban Studies, 1962).

5. Schmeckebier, op. cit. supra n. 2, at 66.

6. See generally, 1 Antieau, Municipal Corporation Law § 5.22 (1966).

We conclude that the scope of police regulations is not limited to the subjects which petitioner urges upon us. Aside from the sovereignty of Congress, the limitation on the scope of reasonable and usual police regulations is primarily functional in character: such regulations must be "necessary for the protection of lives, limbs, health, comfort and quiet of * * * persons and the protection of * * * property within the District of Columbia." 27 Stat. 394 (1892); see Crane v. District of Columbia, 53 App.D.C. 159, 289 F. 557 (1923). If they meet that test they must be upheld.

### III

We turn to the question of whether the regulations here involved are "reasonable and usual police regulations" within the purposes of the Joint Resolution of 1892.

Police regulations promulgated by the Commissioners must be reasonable. Montz v. District of Columbia, 20 App.D.C. 568 (1902). Regulation of a subject which does not "endanger, disturb, annoy, or incommode the people" and does not "produce results at variance with the purposes contemplated by [the Joint Resolution of 1892]" is beyond the powers of the Commissioners. Crane v. District of Columbia, supra. But precedent suggests that a regulation is reasonable if its subject is one which is "naturally productive of material discomfort to persons of ordinary susceptibilities, tastes, and habits." Heylman v. District of Columbia, 27 App.D.C. 563 (1906).

The Commissioners held extensive public hearings to determine whether the promulgation of fair housing regulations was necessary.[7] As a result of those hearings the Commissioners determined that discrimination on account of race in the sale and leasing of housing accommodations exists in the District of Columbia. They further found that this condition: (1) promotes crowded Negro housing and higher prices for equivalent accommodations, and (2) is "likely to result in danger to the lives, limbs, health, comfort, quiet and property of the inhabitants of the District of Columbia" in that there is a clear relationship between poor housing conditions and the health and comfort of the occupants. Police Regulations, supra. It seems clear enough that such a condition is productive of material discomfort and does endanger, disturb or incommode the people. Heylman v. District of Columbia, supra; Crane v. District of Columbia, supra. Petitioner has not made any constitutional attack on the substance of the regulations, and without deciding that question we conclude that the Fair Housing Regulations are "reasonable police regulations." Compare Nebbia v. People of State of New York, supra, 291 U.S. at 523–527, 54 S.Ct. 505.

The Supreme Court, as already stated, has held that the laws passed by the Legislative Assembly of the District of Columbia prohibiting discrimination in public restaurants on the basis of race are police regulations and, therefore, were not repealed by the legislation repealing or abolishing the Assembly. The Court considered those laws "as local in character as laws regulating public health, schools, streets, and parks," Thompson, supra, 346 U.S. at 113, 73 S.Ct. at 1014, and approved the test applied in Johnson v. District of Columbia, 30 App. D.C. 520, 522 (1908). There it was held that an act of the Legislative Assembly prohibiting cruelty to animals was legislation "in the interest of peace and order and conduces to the morals and general welfare of the community," and therefore was a police regulation which had not been repealed.

This court, relying upon Thompson, has said that an act which prohibits discrimination on account of race in places of public amusement is a regulatory measure in the

---

7. Public Hearings on Discriminatory Housing Practices in the District of Columbia (D. C. Board of Commissioners, November 30, December 3, 1962).

nature of a police regulation. Central Amusement Co. v. District of Columbia, D.C.Mun.App., 121 A.2d 865 n. 1 (1956). The Supreme Court of Missouri, also relying upon *Thompson,* has held that a Kansas City ordinance prohibiting discrimination on account of race in public restaurants is a valid exercise of a delegation of power to regulate restaurants. Marshall v. Kansas City, Mo. 355 S.W.2d 877, 882–883, 93 A.L.R.2d 1012 (1964); see Annot., 93 A.L.R.2d 1028 (1964); Note, 39 Notre Dame Law, 607 (1964). Because of the similar character of the regulations here in issue, we hold that they are "usual police regulations" under the Joint Resolution of 1892.

We have considered all of petitioner's arguments, and have concluded that the record is free of error.

Affirmed.

MYERS, Associate Judge (dissenting):

I am unable to agree with the conclusion of my colleagues that the Commissioners of the District of Columbia, relying on the authority granted them by a Congressional Joint Resolution adopted in 1892 to issue "reasonable and usual police regulations," did possess the power to make and promulgate in 1963 "fair housing" regulations for the District of Columbia under which petitioner's license as a real estate broker was suspended by the Real Estate Commission of the District of Columbia for violation thereof.

Whether discrimination in the sale or rental of real property on the basis of race, color, creed or national origin should be banned in the District of Columbia is not for the courts to decide but is a matter for legislative determination. Whether such legislation is either necessary or Constitutional has been discussed and debated widely, heatedly and vigorously—with equal sincerity by those who favor such legislation and those who oppose it. The final results of these efforts both for and against it have yet to be fully measured and made known both at national and state levels.[1] My dissent is not directed to the merit or legality of "fair housing" regulations as such, but questions the authority of the Commissioners of the District of Columbia to adopt and promulgate such regulations in this jurisdiction without either direct or indirect authority from Congress to do so. In my opinion, the legislative history of the enabling Resolution of 1892, the cases which have construed the Commissioners' power, and the continued recognition by both the Commissioners and Congress of the inherent limitations on the power authorized by the Resolution, compel the conclusion that adoption of a "fair housing" policy to be enforced in the District of Columbia is solely within the province of Congress as the determinative legislative body of the District of Columbia.

The Commissioners possess no powers of legislation except such as are derived from Congress which exercises sovereign plenary power over the District as expressly delegated by Art. I, § 8, clause 17 of the Constitution. Congress has unlimited jurisdiction to provide for every purpose of municipal government, including the general welfare and protection of all citizens and their property within the District of Columbia. This overall, sweeping power is comparable to the powers which the legislature of a state may exercise within that state, as well as the power of the state itself. This Congressional authority includes the right to define the power of the Commissioners to enact regulations incidental to the control and ownership of personal and real property by local residents.

Prior to 1892 the Commissioners were vested with little legislative authority, re-

1. See generally, Avins, Open Occupancy vs. Forced Housing Under the Fourteenth Amendment: A Symposium on Anti-Discrimination Legislation, Freedom of Choice, and Property Rights in Housing (1963); Pearl & Turner, Fair Housing Laws: Halfway Mark, 54 Geo.L.J. 156 (1965).

quiring Congress itself to adopt, enact or promulgate many ordinances and regulations relating to the government of the municipality. To lessen the burden which thus devolved upon Congress, a Joint Resolution in 1892 delegated to the Commissioners authority

> to make and enforce all such *reasonable and usual police regulations* in addition to those already made under the act of [1887] as they may deem necessary for the *protection of lives, limbs, health, comfort and quiet of all persons* and the *protection of all property* within the District of Columbia. 27 Stat. 394 (1892). [Emphasis supplied.]

The majority opinion takes the view that by virtue of this Resolution the Commissioners had the authority, under the guise of the exercise of reasonable and usual police power, to issue and enforce regulations affecting substantial rights of citizens in the District of Columbia. I do not agree. "Fair housing" legislation is, to say the least, a subject both explosive in nature and difficult of solution by fair and Constitutional methods—a subject which has posed almost insurmountable difficulty to state legislatures and Congress. It is inconceivable that by the Resolution of 1892 Congress intended to give the Commissioners authority to issue regulations which would have such an impact upon the rights of property owner-

ship in the District of Columbia and of the freedom of its citizens to contract—rights protected by Constitutional safeguards. Certainly regulations of this character, which must necessarily contemplate a compromise between competing Constitutional and statutory protections, should be left not to the determination of three Commissioners but to the careful research, study, deliberation and decision of Congress as the District's legislative body.

In this connection, attention is called to a hearing held on March 28, 1963, by a subcommittee of the House Committee on the District of Columbia, at which the Commissioners and the Corporation Counsel for the District of Columbia were present by invitation.[2] The members present expressed serious doubt that Congress had in fact and in law delegated authority to the Commissioners to promulgate regulations which would directly or indirectly limit the rental or sale of private property.[3] The Commissioners were asked to suspend and defer adoption of any such regulations pending full and complete hearings and consideration by the 88th Congress of this very controversial and important proposal, "a matter of serious import * * * which fully justifies mature and deliberate consideration on the part of all of us who have the responsibility in connection with the government of the District of Columbia." [4] The Commissioners frankly advised the sub-

---

2. See Hearing before Subcommittee 6 of the Committee on the District of Columbia of the House of Representatives on Proposed District of Columbia Antidiscrimination Regulations Relating to the Sale or Rental of Private Property, March 28, 1963.

3. A report submitted to Subcommittee 6 of the House Committee on the District of Columbia by the Committee's legislative research staff states:
 A study of Acts of Congress, enacted both before and after the date of the act of February 27, 1892, shows clearly that neither the Congress nor the Commissioners have considered that any such broad delegation of police powers, as is so claimed was intended or made.

The Congress has repeatedly enacted legislation employing the police powers for purposes much narrower in scope, and the Commissioners of the District have repeatedly requested legislation of similar narrower scope than that involved in the proposed antibias regulations. Id. at 23.

The report then follows with a comprehensive listing of certain sections of the District of Columbia Code, of bills which were not enacted, and of legislation pending in 1963 before the same Committee. All were much narrower and of less import than the fair housing regulations; all were the subject of requests by the Commissioners for Congressional action.

4. Id. at 2.

committee that they would defer further action only until Congress had the opportunity to legislate in the matter; that if the Committee determined there was no need for such legislation and Congress refused to legislate, they planned to promulgate their own regulations. Subsequently, on December 31, 1963, the Commissioners put into effect the "fair housing" regulations which are the basis for the present suspension action against petitioner.

I cannot find from the record any real or substantial relationship between the "fair housing" regulations and the objectives of "usual and reasonable police regulations" to *protect* "lives, limbs, health, comfort and quiet of all persons and * * * of all property" in the District of Columbia, except through a strained, unrealistic interpretation of the Resolution of 1892. By my colleagues' approval of the broad interpretation given to this Resolution by the District of Columbia Commissioners, almost anything desired by the Commissioners could be promulgated as the exercise of police power, even when, as here, Congress has shown a disinclination to approve legislation in the same area. The effect of these "fair housing" regulations, issued under the shibboleth of antidiscrimination regulations, goes far beyond the "usual" or "reasonable" police regulation authorized or intended under the Joint Resolution of 1892.[5]

Respondent concedes that when Congress has acted on a subject, no attempt at further legislation by the Commissioners in that area would be valid. It is my opinion that Congress has already preempted the field covered by the scope of the "fair housing" regulations. The passage by Congress of many acts and resolutions governing the possession, sale and rental of privately-owned property in the District of Columbia (and the many related phases of real estate operation here, such as titles, conveyancing, licensing and disciplinary supervision of real estate brokers and salesmen) lends support to my position that the Commissioners may not concurrently regulate the transfer of title or possession of real estate.

Furthermore, in view of the unique role of Congress as the duly empowered legislative body for the District of Columbia, any doubt respecting the extent of the legislative authority delegated to the Commissioners must be resolved in favor of nondelegation. To prevent an unintentional usurpation of the plenary powers of Congress, a strict interpretation of any ambiguous language defining the limits of delegated authority is compelled.[6]

The majority relies upon the Supreme Court decision of *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 73 S.Ct. 1007 (1953). *Thompson* rested not upon the Joint Resolution of 1892 but upon a statute prohibiting discrimination in public restaurants enacted by the Legislative Assembly for the District of Columbia, a body duly empowered to consider and pass bills extending "to all rightful subjects of

---

**5.** In addition, there is serious question as to the legality of *any* regulations promulgated under that section of the Joint Resolution of 1892 which grants general police power to the Commissioners. The records of Congress, and of each House, indicate that a discrepancy existed in the versions of the bill approved by the Senate and the House of Representatives. See 23 Cong.Rec. 1132, 1316, 1328, 1384, 1402, 1471 (1892); S.Jour., 1st Sess., 52nd Cong., 111, 117, 123, 126 (1892); H.R. Jour., 1st Sess., 52nd Cong., 74, 77–78 (1892). See also Opinion of Milton D. Korman, Acting Corporation Counsel, to the Commissioners of the District of Columbia, November 13, 1962; Hearing, supra note 2, at 20–21. If, in fact, the delegation of police power was improperly enacted, whether acquiescence and time have cured any Constitutional defect under Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), is not properly before the court at this time.

**6.** Cf. The Binghamton Bridge (Chenango Bridge Co. v. Binghamton Bridge Co.), 3 Wall. (70 U.S.) 51 (1866); 3 Sutherland, Statutory Construction §§ 6401, 6402, 6501 n. 8–9 (1943).

legislation" within the District.[7] Although all legislation of the Assembly was generically repealed by Congress in 1901, the repealing act provided exceptions, including:

> Third: Acts and parts of acts relating to the organization of the District government, or to its obligations, or the powers or duties of the Commissioners of the District of Columbia, or their subordinates or employees, or to police regulations, and generally all acts and parts of acts relating to municipal affairs only, including those regulating the charges of public-service corporations.[8]

In *Thompson* the Supreme Court held that the antidiscrimination statute enacted by the Legislative Assembly could be sustained as a "police regulation," pointing out that:

> Regulation of public eating and drinking establishments in the District has been delegated by Congress to the municipal government from the very beginning. In terms of the history of the District of Columbia there is indeed no subject of legislation more firmly identified with local affairs than the regulation of restaurants. [Footnotes omitted.] [9]

While regulation of restaurants may be "usual" and related to municipal affairs, *Thompson* is not applicable to the case at bar involving regulation of the sale and rental of real property since the 1892 Resolution makes no provision for such broad and far-reaching legislation restraining and restricting individual rights in the ownership of property. The enabling language of the Joint Resolution is narrower in scope than the antidiscrimination statute in *Thompson* and the "police regulations" reasonably contemplated thereunder are necessarily of a more restricted quality and nature. *Thompson* does make clear, however, that the delegation of legislative authority by Congress to the District of Columbia must be subject to Constitutional limitations and that the use of such delegated power must be grounded upon "reasonable and usual police regulations." In the light of the lesser grant of authority to the Commissioners than to the Assembly, I am persuaded that *Thompson* is inapplicable as a controlling definition of "reasonable and usual police regulations" for the proposition here before us.

For the above reasons I would hold that the promulgation of "fair housing" regulations by the Commissioners on December 31, 1963, was without valid legislative authority; that such regulations are, therefore, illegal and void; and that the order issued by the District of Columbia Real Estate Commission suspending the license of petitioner for forty-five days was null and void and should be reversed.

---

7. Organic Act of February 21, 1871, § 18, 16 Stat. 419; 346 U.S. at 105, 73 S.Ct. 1007.

8. Code of 1901, § 1636, 31 Stat. 1189; 346 U.S. at 112, 73 S.Ct. 1007.

9. 346 U.S. at 113, 73 S.Ct. at 1007.