**FIREMEN'S INSURANCE COMPANY OF WASHINGTON, D. C.**

v.

**Walter E. WASHINGTON et al., Appellants.**

**No. 71-2009.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1972.

Decided July 31, 1973.

---

5. *Supra* note 1.

6. *Id.*

7. *Id.*

10. *Supra* note 8.

11. 1A Sutherland, Statutory Construction § 23.10 (Sands 4th ed. 1972).

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., for the District of Columbia, with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellants.

James Brent Clarke, Jr., Washington, D. C., for appellee. William E. Miller and James V. Dolan, Washington, D. C., also entered appearances for appellee.

Jean Camper Cahn, G. Dan Bowling and Michael Valder, Washington, D. C., filed a brief on behalf of The Urban Law Institute of Antioch College as amicus curiae urging reversal.

Before BAZELON, Chief Judge, SOBELOFF,[*] Senior Circuit Judge for the Fourth Circuit, and LEVENTHAL, Circuit Judge.

BAZELON, Chief Judge:

In this suit against the District of Columbia, the Firemens' Fund Insurance Co. successfully challenged the validity of two insurance regulations adopted by the District of Columbia Council.

During 1969 and 1970, the Government Operations Committee of the Council conducted hearings on insurance problems in the District and uncovered what it termed an "insurance crisis." The hearings disclosed a widespread practice of refusing to underwrite basic property insurance in the inner-city solely on the basis of the environmental hazards presented by the geographic location of the property. The committee found the resultant unavailability of insurance to inner-city businesses and homeowners inhibited economic development and contributed to the deteriora-tion of physical structures in urban core areas. The committee took note of an "epidemic of cancellations" of policies in the city and found that discrimination against inner-city dwellers in underwriting automobile insurance left many of those citizens uncompensated for serious injuries or economic losses sustained in auto accidents.[1] On the basis of these findings, the committee concluded that action was urgently needed to protect the property and citizenry of the District. Accordingly, on March 2, 1971, the full Council adopted Regulation 71–8, "Prohibiting Geographic Discrimination in the Issuance of Fire, Auto and Casualty Insurance," and Regulation 71–13, "Prohibiting Arbitrary Cancellations." After presentation to Mayor Washington, these regulations became law on March 13, 1971.[2] Regulation 71–8 went into effect on March 22, 1971, and 71–13, by its own terms, became effective on May 12, 1971.

The pertinent language of the two regulations is set forth in the margin;[3]

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d). Senior Circuit Judge Sobeloff participated in the decision and concurred in the opinion herein before his death on July 11, 1973.

[1]. Report of the District of Columbia Council Insurance in the District of Columbia, Nov. 20, 1970.

[2]. The Regulations were neither approved nor disapproved by the Commissioner (Mayor) during the ten day period following their adoption by the Council and presentation to the Commissioner (Mayor). Accordingly, they became law at the end of that period. Reorganization Plan No. 3 of 1967, Title I D.C.Code, Appendix, § 406(c).

[3]. Regulation 71–8 provides in pertinent part as follows:
*Section 1. Geographic Discrimination*
(a) No insurer, policy-writing agent, soliciting agent, broker, or salaried company employee shall decline to insure or to renew contracts of insurance because of the geographic area within the District of Columbia wherein is located the subject of the risk or the applicant's or insured's address.

(b) The prohibition contained in subsection (a) shall not act to prevent an insurer, agent, broker, or company employee from declining to issue contracts of fire or property insurance due to a determination, after on-site inspection and written report, that the condition of the property proposed to be insured does not meet applicable underwriting standards, provided that an applicant for such insurance shall be furnished a statement describing such improvements as are necessary to bring said property into conformity with applicable underwriting standards.

(c) The prohibition contained in subsection (a) shall not act to prevent an insurer, agent, broker, or company employee from declining to issue contracts for fire or property insurance due to a determination that the property proposed to be insured will cause, due to its geographic location, a concentration of liability which will exceed reasonable underwriting standards based upon actual properties then insured, and, either (i) excessive loss experience or (ii) potential excessive loss experience within such geographical area, provided that a copy of the underwriting standard shall be furnished to the applicant for in-

**1326**

in brief, they provide as follows. Regulation 71–8 prohibits an insurance company from considering geographic location or any other "environmental factor" over which the insured has no control, in determining whether to insure or continue to insure a risk in the District. The only exception is where the particular company has an over-concentration of liability in a single high-risk area. Regulation 71–13 prohibits cancellation not in conformance with its dictates. Cancellation is permitted only for specified reasons, which include: (1) non-payment of premium; (2) willful misrepresentation in an application or a claim; (3) transfer of ownership resulting in an increased exposure to risk; or (4) (for auto insurance) loss of operator's license or owner's registration. Cancellation is conditioned on 30 days notice to both the insured and the Superintendent of Insurance, accompanied by an explanation of the grounds. Non-renewal must also be preceded by a statement of the grounds and 30 days notice to the insured. A non-renewal or cancellation notice must inform the policyholder of alternative sources of insurance, such as the assigned risk pool. Penalties are provided for violations of either 71–8 or 71–13.

On May 24, 1971, appellee, Firemen's Fund Insurance Co. filed a complaint in District Court seeking a declaration of the invalidity of these two regulations and an injunction against their enforcement. On October 18, 1971, the District Court, 333 F.Supp. 951, granted summary judgment for appellees, holding that the regulation of insurance is not "a 'usual' or valid exercise of police power by a municipality, nor is it the 'usual' exercise of police power by the municipal government of the District of Columbia." This appeal is from that determination.

surance, if denied, and provided that the Superintendent of Insurance may within his discretion rule on the reasonableness of the applicable underwriting standard, and provided further that in any action arising with respect to this section the burden of proof of reasonableness of the underwriting standard shall be on the proponent of the underwriting standard.

Regulation 71–13 provides in pertinent part as follows:

*Section 2. Permissible reasons for cancellation*

a. No automobile policy shall be cancelled, nor shall any cancellation be effective for any purpose, unless the insured has either:

1. refused or failed to pay a premium due under the terms of the policy; or

2. been subjected to suspension of his operator's permit at any time during the policy period if he is the named insured in an operator's policy; or

3. been subjected to suspension of the registration of a motor vehicle designated in his owner's or automobile policy at any time during the policy period, if as a result of such suspension no motor vehicle specifically described in such owner's policy is validly registered; or

4. made a material and willful misstatement or omission of fact to the insurer or its employees, agents or brokers in connection with any application to or claim against, such insurer; or

5. the motor vehicle or other interest of the insured shall have been transferred to a person other than the insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the motor vehicle, interest or use thereof shall have materially changed with respect to its insurability.

b. No other policy shall be cancelled nor shall such cancellation be effective for any purpose, unless either:

1. the insured has refused or failed to pay a premium due under the terms of the policy; or

2. the insured has made a material and willful misstatement or omission of fact to the insurer or its employees, agents, or brokers in connection with any application to or claim against such insurer; or

3. the property or other interest of the insured shall have been transferred to a person other than the insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

## I

Congress, in legislating for the District, has all the powers of a state legislature,[4] and Congress may delegate to the District government that "full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted." District of Columbia v. Thompson Co., 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953). The City Council, while possessing no inherent legislative authority, does have a broad delegation of police power from Congress.[5] The instant regulations were promulgated pursuant to 1 D.C. Code § 226 (1967), which provides that the District government may "make and enforce all such reasonable and usual police regulations . . . as [it] deem[s] necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia."

The District of Columbia Court of Appeals has defined the scope of the power conferred on the local government by § 226.

> Aside from the sovereignty of Congress, the limitation on the scope of reasonable and usual police regulations is primarily functional in character: such regulations must be "necessary for the protection of the lives, limbs, health, comfort and quiet of . . . persons and the protection of . . . property within the District of Columbia. . . . " If they meet that test they must be upheld. Filippo v. Real Estate Commission of the District of Columbia, 223 A.2d 268, 273 (D.C.Ct.App.1966) (citations omitted); see Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington, 142 U.S.App.D.C. 375, 379, 442 F.2d 123, 127 (1971).

According to this functional test, the regulations before us are valid. Basic property insurance is certainly closely related to the protection of property. In addition, access to insurance by inner-city businessmen, landlords and homeowners is necessary to the encouragement of business investment and the restoration of realty in urban core areas. Without property insurance, ghetto merchants would be hard put to secure business loans or even merchandise on credit. Home improvement loans and mortgages would similarly be unavailable, severely inhibiting the renovation of depressed areas of the city.[6] And, the regulation of auto insurance is essential to the protection of the lives, limbs, and health of citizens in the District.[7]

Appellee argues, however, that the local government does not have the power to impose substantive regulations on the business of insurance because it has never exercised that power before and because there have been no reported cases upholding *municipal* regulation of insurance. First, it is clear that "powers [once granted] . . . are not lost by being allowed to lie dormant." National Petroleum Refiners' Ass'n v. FTC, 482 F.2d 672 at 694 (D.C.Cir.

4. U.S.Const. art. I, § 8, cl. 17; Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); District of Columbia v. Thompson Co., 346 U.S. 100, 108, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953).

5. Maryland & D. C. Rifle & Pistol Ass'n v. Washington, 142 U.S.App.D.C. 375, 442 F. 2d 123, 126 n. 14 (1971); Filippo v. Real Estate Comm'n of the District of Columbia, 223 A.2d 268, 271 (D.C.Ct.App. 1966); see District of Columbia v.

Thompson Co., 346 U.S. 100, 109–111, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953).

6. *See generally*, Report of the President's National Advisory Panel on Insurance in Riot-Affected Areas; Meeting the Insurance Crisis of Our Cities 1–7 (1968).

7. For a discussion of the problems of providing automobile insurance for low income drivers, see Note, A Social Insurance Scheme for Automobile Accident Compensation, 57 Va.L.Rev. 409, 424–29 (1971).

1973) *quoting* United States v. Morton Salt Co., 338 U.S. 632, 647–648, 70 S.Ct. 357, 366, 94 L.Ed. 401 (1950). Nor does the fact that no previous case has upheld a municipality's exercise of the police power to regulate insurance compel the conclusion that the Council is without such power.[8] The police power is not restricted or limited to present applications, but is a flexible and dynamic concept which changes and expands as society becomes more complex. As it has evolved, it has, for example, encompassed, the power to zone, Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and to control urban renewal, Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

■■ Appellee further argues that because the substantive regulation of insurance has traditionally been considered beyond the pale of municipal regulation and been left to states, only Congress, acting as the state legislature for the District, may undertake to regulate that industry. This argument ignores not only the Supreme Court's express instruction that the "full legislative authority" of Congress may be delegated to the District government, but also the *sui generis* nature of governance in the District. *Filippo, supra*, 223 A.2d at 272. Insurance regulation usually occurs at the state level because of the need for uniformity within the state and to benefit from the economy of scale that results from having a single state regulatory authority. Neither rationale is applicable in the District. In many respects the District is more akin to a state than to a municipality. The District is a unique entity in that it exercises "a great variety of governmental functions, including not only those which are commonly exercised by

cities but others, like * * * the regulation of insurance * * *, which are commonly exercised by states." Chewning v. District of Columbia, 73 U.S.App. D.C. 392, 394, 119 F.2d 459, 461, cert. denied, 314 U.S. 639, 62 S.Ct. 74, 86 L.Ed. 513 (1941). The regulation of insurance is within the state's police power, *see, e. g.*, Commonwealth v. Vrooman, 164 Pa. 306, 30 A. 217 (1894). When Congress delegates its police power to the local government, that entity's powers become as broad as those of Congress, limited only by the Constitution or specific Congressional enactment. Accordingly, the delegation of power effected by 1 D.C.Code § 226 encompasses the substantive regulation of insurance.

**II**

■■ Having found the challenged regulations within the concurrent police power of the Council, we must now turn to the question whether those regulations are pre-empted by statute. Appellee argues that Congress has enacted considerable legislation on the subject of insurance in the District, pre-empting further regulation by the Council. It was also argued in Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington, 142 U.S.App.D.C. 375, 442 F.2d 123 (1971) (hereinafter *Pistol Ass'n*) that "congressional legislation on a particular subject thwarts additional regulation of that subject by the District." [9] The *Pistol Ass'n* court clearly rejected this thesis, concluding that:

> Nor is there room for local regulation where the legislature has dealt with the subject in such manner as to indicate plainly that no further action respecting it is tolerable. *But we cannot agree that municipal regulation is precluded simply because the legisla-*

8. *Cf.* City of Chicago v. Phoenix Ins. Co., 126 Ill. 276, 18 N.E. 668 (1888) (striking down a municipal insurance tax as preempted by state statute).

9. The Regulation at issue in *Pistol Ass'n* was promulgated pursuant to Congress'

specific delegation of police power for the regulation of firearms, 1 D.C.Code § 227, rather than the more general grant of power in § 226. Once the authority to promulgate the challenged regulation is found, this distinction is immaterial to the question of pre-emption.

*ture has taken some action in refer-ence to the same subject.* 442 F.2d at 130 (emphasis added).

The court went on to define when "no further action . . . is tolerable."

> The important consideration . . . is not whether the legislature and municipality have both entered the same field, but whether in doing so they have clashed. Statutory and local regulation may coexist in identical areas although the latter, not inconsistently with the former, exacts additional requirements, or imposes additional penalties. The test of concurrent authority . . . is the absence of conflict with the legislative will. *Id.*

The challenged municipal regulations exact additional requirements of insurers and impose additional penalties for the violations thereof. We must, therefore, determine whether those regulations conflict with any specific enactments of Congress.

■ Appellee suggests three possible sources for such a clash between statute and regulation. The first is the District of Columbia Insurance Code, D.C.Code Title 35. In *Pistol Ass'n*, we were concerned with a potential conflict between Congress' comprehensive gun control program and the municipality's gun control regulations. The court observed that there was at least reasonable doubt as to whether Congress had meant to pre-empt the field by its general legislation. Given the potentially greater responsiveness of local government to local problems and the recognition that Congress cannot realistically be expected to deal with every aspect of a local problem, the court determined that the municipality should be given the benefit of that reasonable doubt and upheld the local regulation. Here there is at least a reasonable doubt whether Congress meant to totally pre-empt the field of insurance regulation by enactment of the Insur-ance Code. We therefore conclude that the local government may legislate interstitially—to fill the gaps in the statutory scheme.

As to clashes between specific provisions of the Insurance Code and the regulations, we find none. The Code nowhere deals with the problem of arbitrary cancellations, as does Regulation 71–13. Nor does the Code deal with the problem of red lining, the geographic discriminations in underwriting banned by Regulation 71–8. Appellee asserts that 35 D.C.Code § 1503(c) does in fact deal with red lining, in that it states: "Nothing in this section shall be taken to prohibit as unfairly discriminatory the establishment of [rate] classifications . . . based upon . . . location." This provision pertains only to the setting of rates, a question not dealt with by Regulation 71–8, while the regulation concerns the decision whether to issue, cancel, or renew a policy, which is not affected by 35 D.C.Code § 1503(c).

Appellee next asserts that the regulations conflict with the District of Columbia Automobile Insurance Plan, created pursuant to 35 D.C.Code § 1505(d), and are therefore invalid at least as to automobile insurance. 35 D.C.Code § 1505 was enacted in 1948 to avoid the effect of the Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440 (1944), which held insurance to be interstate commerce subject to the antitrust laws. The statute provides an antitrust exemption for insurers in the District to co-operate, *inter alia*, in the operation of an assigned risk pool for auto insurance. There is no indication that Congress intended to thereby insulate the auto insurance market from local regulation; nor that Congress intended a driver with a good record be forced into the assigned risk pool, with its higher premiums and lower available coverages,[10] purely on the basis of his

---

10. For a general discussion of assigned risk plans, see Dep't of Transportation, Insurance Accessibility for the Hard to Place Driver (1970) (prepared for DOT by the Division of Industry Analysis, Federal Trade Commission).

neighborhood. Accordingly, we cannot say that Regulation 71–8, prohibiting geographic discrimination, conflicts with the statutory authorization for the District of Columbia Automobile Insurance Plan.

Nor can we find any conflict with Regulation 71–13 prohibiting arbitrary cancellations. Although the assigned risk plan has its own cancellation provisions,[11] policies issued under the auspices of the plan are specifically exempted from the operation of the regulation.[12] The regulation affects only insurance secured in the normal market. In fact, the regulation appears to supplement the assigned risk plan, by requiring that a cancellation or non-renewal notice inform the policyholder of the possibility that he might be eligible for insurance under the plan.

Appellee also asserts that the challenged regulations are invalid as to basic property insurance because they inter-. fere with the effective functioning of the District of Columbia Insurance Placement Act. 35 D.C.Code § 1701 et seq. (Supp. V 1972). In 1968, Congress passed the Urban Property Protection and Reinsurance Act[13] to deal with a growing insurance crisis in urban core areas, particularly the riot corridors of the urban ghettos. The House Report noted that:

In the rundown, blighted areas of some cities, private insurance compa-

nies have determined, in many instances, that it is not economically feasible to provide insurance protection. This determination has led to the practice of "red lining" entire neighborhoods, which results in an almost automatic denial of insurance for reasons of location alone . . .

H.Rep.No.1585, 90th Cong., 2d Sess. (1968); 1968 United States Code Congressional and Administrative News at p. 2951.

This national legislation left it to the states to enact implementing FAIR (fair access to insurance requirements) plans, but provided limited federal reinsurance for participating programs. Congress enacted the District of Columbia Insurance Placement Act to provide the FAIR plan for the District. The purposes of the Placement Act were defined as follows:

■ to assure the availability of basic property insurance; . . . and . . .

■ to provide for the equitable distribution among insurers of the responsibility for insuring qualified property in the District of Columbia for which insurance cannot be obtained through the normal insurance market and to authorize the establishment of a joint underwriting association . . . to provide for reinsuring of basic property insurance

---

11. The assigned risk plan is authorized by Congress but its cancellation provisions are neither mandated nor controlled by statute. The plan's manual provides that cancellation may be made if the insured:
  (1) is not or ceases to be eligible or in good faith entitled to insurance, or
  (2) has failed to comply with reasonable safety requirements, or
  (3) has violated any of the terms or conditions upon the basis of which the insurance was issued, or
  (4) has obtained the insurance through fraud or misrepresentation, or
  (5) has failed to pay any premiums due under the policy.

"A statement of facts in support of each such cancellation shall be furnished to the Plan 10 days prior to the effective date of cancellation." A policyholder, given notice of cancellation, may appeal to the governing committee. District of Columbia Automobile Insurance Plan—Manual, July 1, 1972 §§ 18–19.

12. Section 9 of Regulation 71–13 states that the regulation "shall not apply to the policies of insurance issued under the District of Columbia Insurance Placement Act (FAIR plan), [or] the District of Columbia Automobile Insurance (D.C. A.I.P.) [plan] . . . ."

13. 12 U.S.C. § 1749bbb.

without regard to environmental hazards. 35 D.C.Code § 1701.[14]

All District insurers participate in the FAIR plan on a ratable basis pegged to each company's proportion of the District's total fire insurance premium volume. The joint underwriting association provides reinsurance and the program is eligible for the federal reinsurance benefits.

The Placement Act deals with exactly the same problem of red lining as does Regulation 71–8.[15] The Act's solution is an equitable distribution of the hazards posed by such high-risk properties among private insurers. By eliminating environmental hazards form the underwriting decision, Regulation 71–8 leaves the volume of such high risk properties insured by each company to be determined not by an equitable apportionment but by the vagaries of the geographic distribution of the company's applicants. The regulation thus results in a different distribution of risks than that intended by the Placement Act. Since Regulation 71–8 does interfere with Congress' solution to the red lining problem, it is pre-empted, hence invalid, as to basic property insurance.

The Placement Act does not deal with the problem of arbitrary cancellations of policies secured in the normal market and Regulation 71–13 is inapplicable to insurance secured through the Placement Act facility.[16] Nor do the non-renewal provisions of the Regulation interfere with the distribution of risks intended by the Act. The Regulation does not require renewal; it merely conditions a failure to renew on the company's informing the policyholder of its reasons. Thus, no company is, in effect, locked into covering a high risk property beyond the term of its pre-existing policy. Since Regulation 71–13 neither conflicts nor interferes with the operation of the Placement Act,[17] it is not pre-empted.

In summary, we affirm the judgment below only insofar as it held Regulation 71–8 (prohibiting geographic discrimination) invalid as to basic property insurance because pre-empted by Congressional enactment. We reverse the judgment below to the extent that it otherwise held Regulations 71–8 and 71–13 invalid.

Judgment accordingly.

14. Environmental hazards are defined as: [A]ny hazardous condition that might give rise to loss under an insurance contract, but which is beyond the control of the property owner. 35 D.C.Code § 1702(3).

15. The FAIR plan program has been repeatedly criticized as failing in its purpose of providing adequate access to insurance for owners of urban core properties. *See, e. g.,* Note, The Central City Insurance Crisis; Experience Under the Urban Property Protection and Reinsurance Act of 1968, 38 U.Chi.L.Rev. 665 (1971).

16. See note 12, *supra.*

17. The Regulation may, in fact, facilitate the operation of the Placement Act by requiring notices of cancellation and non-renewal to inform the policyholder of his possible eligibility for insurance from the Placement Act facility.