NEWSPAPERS, INC., et al., Appellants,

v.

METROPOLITAN POLICE
DEPARTMENT, et al.,
Appellees.

No. 86–1677.

District of Columbia Court of Appeals.

Argued March 8, 1988.
Decided Aug. 29, 1988.

Patti A. Goldman, with whom Alan B. Morrison and David C. Vladeck, Washington, D.C., were on the brief, for appellants.

Donna M. Murasky, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before NEWMAN, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

This appeal presents the question whether the Duncan Ordinance, 1 DCMR § 1000 *et seq.* (1986), is a "statute" within the meaning of Exemption 6 of the District of Columbia Freedom of Information Act (FOIA), D.C.Code § 1–1524(a)(6) (1987 Repl.Vol.). We hold that it is not and, therefore, could not be the basis for denying the request of appellants, the publisher and a reporter of the Milwaukee Sentinel newspaper ("the Sentinel"), for records concerning the arrest of Robert W. Kasten, Jr., a United State's Senator from Wisconsin, for driving while intoxicated.[1] Appellees, the Metropolitan Police Department (MPD) and the Office of the Corporation Counsel (Corporation Counsel), denied the Sentinel's requests for the records based on Exemption 6 of the FOIA, D.C.Code § 1–1524(a)(6), which shields records that

---

1. Senator Kasten was voluntarily dismissed from the case prior to the granting of summary judgment and is not a party to this appeal. See note 3, *infra*.

are "specifically exempted from disclosure by statute." They claimed that the Duncan Ordinance, which prohibits the disclosure of arrest records under certain circumstances, was such a statute. The Sentinel filed suit to force disclosure of these records and now challenges the summary judgment granted in favor of the appellees. Because we conclude that the legislative authority delegated by Congress to the Board of Commissioners of the District of Columbia, the body that promulgated the Duncan Ordinance, did not include statutory power as that term was used by the Council of the District of Columbia in enacting Exemption 6, we reverse.

I

On December 12, 1985, Senator Kasten was arrested by District police officers for driving while intoxicated. By letters dated December 23, 1985, the Sentinel filed FOIA requests with the MPD and the Corporation Counsel for records concerning the "arrest and subsequent court appearance of Senator Kasten."[2] Both the Corporation Counsel and the MPD denied the Sentinel's requests, and the Sentinel appealed those denials, first to the Corporation Counsel and then to the Mayor. By letter dated June 5, 1986, the Secretary of the District of Columbia acknowledged receipt of the appeal letter, but no substantive response was forthcoming.

On June 12, 1986, counsel for the Sentinel informed Senator Kasten's office of the Sentinel's intention to file a lawsuit to obtain records pertaining to the Senator's arrest. Senator Kasten asked the Sentinel to delay filing the suit in order to give him an opportunity to obtain the records, which the Sentinel agreed to do. By letter dated June 18, 1986, a member of Senator Kasten's staff forwarded to the Sentinel a copy of the press release issued by the MPD, a summary of the contents of the MPD's "desk book," and a copy of the Chemical Test Certification Form, which shows the results of Senator Kasten's breathalyzer tests. The Sentinel already had a copy of the MPD's press release, and had access to the information in the "desk book," which is publicly available. See D.C.Code §§ 4–131, –135 (1981). The Chemical Test Certification Form, which was not previously available, provided the Sentinel with some additional information. However, because the Sentinel was unable to obtain the complete records of the arrest and subsequent proceedings, it commenced an action in Superior Court.[3] See id. § 4–132.

The parties filed cross-motions for summary judgment. At oral argument, appellees contended that the requested arrest records were exempt from disclosure under the Duncan Ordinance because the ordinance is a "statute" within the meaning of FOIA Exemption 6. In an oral ruling, the motions judge granted summary judgment in favor of appellees on two grounds. First, although acknowledging that the Duncan Ordinance is not a statute as that term is commonly construed, the judge concluded that the term "statute" is not necessarily limited to an enactment by an elected legislature but may well include other duly promulgated policies that reflect a considered governmental judgment. Second, the judge recognized that although the Board of Commissioners had only quasi-legislative powers pursuant to delegations of authority by Congress, the Board nevertheless was empowered to promulgate laws, such as the Duncan Ordinance, that were binding on the MPD. Conversely, because the Duncan Ordinance was not a regulation promulgated by the MPD, the judge was satisfied that construing the Duncan Ordinance as a statute fulfilled the

2. In accordance with an agreement with Senator Kasten, the Corporation Counsel entered a *nolle prosequi* to the charge after Senator Kasten successfully completed a counseling program pursuant to a first offender pre-trial diversion program for persons charged with driving while intoxicated *per se.* D.C.Code § 40–716(b)(1) (1981 & 1987 Supp.); *see* 111 Daily Wash.L.Rptr. 1965 (Oct. 12, 1983) (pub-

lishing guidelines for Pre-trial Diversion Program).

3. Senator Kasten sent a letter dated June 23, 1986, to the Sentinel in which he stated, "I have no objection to the release of this information and have no intentions of interfering with the disposition of the lawsuit."

purpose of the FOIA to limit the power of executive agencies to withhold unilaterally information from the public.[4]

## II

The Sentinel contends that the motions judge erred in ruling that the Duncan Ordinance precludes disclosure under FOIA Exemption 6, D.C.Code § 1–1524(a)(6), which by its terms applies only to "statutes." The Sentinel argues that the Duncan Ordinance is plainly not a "statute" because the Board of Commissioners, which promulgated the Ordinance, was not vested with any legislative authority, but was restricted to mere administrative activity, and that the Council of the District of Columbia was well aware of this fact when it enacted the FOIA. Therefore, the Sentinel argues that the judge erred in failing to construe Exemption 6 narrowly in accordance with the FOIA's mandate favoring disclosure of records and to give the term "statute" its ordinary meaning rather than extending the reach of Exemption 6 to include regulations such as the Duncan Ordinance.

Preliminarily, it is important to note what the Duncan Ordinance is. The Duncan Ordinance was promulgated when the Board of Commissioners of the District of Columbia adopted the recommendations of a committee that it had appointed to examine the effect of arrest records on employment opportunity in the District of Columbia. The report concluded that the effects were generally adverse and that broad restrictions on the dissemination of arrest records were required. Specific rule proposals to prevent the routine dissemination of arrest records were contained in the report. On November 2, 1967, the Board of Commissioners approved the proposed rules. It is these rules that are referred to as the Duncan Ordinance, the name being that of the Corporation Counsel who served as chairman of the Committee to Investigate the Effects of Police Arrest Records on Employment Opportunities in the District of Columbia.[5]

Both parties agree, and we concur, that under the Duncan Ordinance, unexpurgated adult arrest records[6] can only be

4. The entire focus of oral argument, and the sole basis for the grant of summary judgment, was whether the Duncan Ordinance was a statute within the meaning of FOIA Exemption 6. On the record before us, it appears that the motions judge, having based his decision exclusively on the Duncan Ordinance, did not reach a number of other arguments that were raised in the parties' motions for summary judgment. For example, appellees contended in their motion for summary judgment that the prosecutor's files, which appellants originally had sought in addition to Senator Kasten's arrest records, were exempt from disclosure. They also contended that the arrest records were exempt from disclosure under FOIA Exemption 2, D.C.Code § 1–1524(a)(2), which exempts "[i]nformation of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." For their part, appellants contended in their motion for summary judgment that FOIA Exemption 3 (C), D.C.Code § 1–1524(a)(3)(C), which exempts from disclosure "Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would: ... (C) Constitute an unwarranted invasion of personal privacy," would not provide an alternative ground for withholding Senator Kasten's arrest records. Since these issues were not decided by the motions judge and are not pursued on appeal, we do not reach them.

5. The original Duncan Report rules appear as an appendix to *Morrow v. District of Columbia,* 135 U.S.App.D.C. 160, 417 F.2d 728 (1969) ("Revisions and Adoption by the Board of Commissioners of Recommendations of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia"). The *Morrow* case also sets forth the legislative history of the Duncan Report rules. *Id.* at 173–75, 417 F.2d at 741–43; *see also Utz v. Cullinane,* 172 U.S.App.D.C. 67, 83–91, 520 F.2d 467, 483–91 (1975). A renumbered version of the Duncan Ordinance is currently published at 1 DCMR § 1000 *et seq.* (1986). Paragraph 6 of the original Duncan Report rules now appears in amended form at D.C.Code § 1–2530 (1981).

6. The Duncan Ordinance pertains only to the dissemination of the MPD's "central criminal records," which document in a more complete fashion the progress of the prosecution of the MPD's arrestees. These records are maintained at the MPD's central police files and are arranged in alphabetical order. D.C.Code § 4–132 (1981); *Morrow, supra* note 5, 135 U.S.App.D.C. at 173, 417 F.2d at 741. The so-called "desk books," which consist of more general information pertaining to arrests, are maintained by each police precinct in chronological order, and are publicly available when not in actual use. D.C.Code §§ 4–131, –135 (1981); *Morrow, supra* note 5, 135 U.S.App.D.C. at 173, 417 F.2d at 741.

obtained by law enforcement agents for legitimate law enforcement purposes. 1 DCMR § 1004.1–1004.3; *Utz, supra* note 5, 172 U.S.App.D.C. at 87, 520 F.2d at 487; *Morrow, supra* note 5, 135 U.S.App.D.C. at 174, 417 F.2d at 742. As to anyone else, including the person to whom the records relate, adult arrest records are available only in expurgated form, *i.e.,* they "shall be released in a form which reveals only entries relating to offenses which have resulted in convictions or forfeiture of collateral," 1 DCMR § 1004.4, and "in a form which reveals only entries relating to offenses committed not more than 10 years prior to the date upon which those records are requested...." *Id.* § 1004.5.[7] Adult arrest records are available in expurgated form to an applicant who is not the person to whom the records relate only upon presentation of a release "in appropriate form executed by the person[] to whom the records may relate." *Id.* § 1004.7. Thus, notwithstanding Senator Kasten's waiver[8] of any objection to the release of his unexpurgated arrest records, the Duncan Ordinance, standing alone, prohibited the release of any arrest records pertaining to his case because Senator Kasten's arrest did not lead to a conviction.

The Duncan Ordinance does not stand alone, however, as the only law in the District of Columbia pertaining to the release of arrest records. Also relevant to the dissemination of arrest records is the FOIA, a D.C. statute of general applicability governing the public's right of access to all records, including arrest records, maintained by the District of Columbia government. The public policy[9] of the FOIA is stated in D.C.Code § 1–1521, which provides:

> Generally the public policy of the District of Columbia is that all persons are enti-

tled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. To that end, provisions of this chapter shall be construed with the view toward expansion of public access and the minimization of costs and time delays to persons requiring information.

Accordingly, this court has held that "[t]he general policy underlying the D.C. FOIA favors disclosure of information about governmental affairs and the acts of public officials, including a narrow reading of exemptions from disclosure." *Dunhill v. Director, District of Columbia Dep't of Transportation,* 416 A.2d 244, 247 n. 5 (D.C.1980). The *Dunhill* court referred to the legislative history which stated that "[T]his policy was 'placed in the legislation to make clear that any actions should serve the purpose of access and that any restriction on that access should be construed narrowly.'" *Id.* (quoting COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY AND CRIMINAL LAW, REPORT ON BILL NO. 1–119, THE "D.C. FREEDOM OF INFORMATION ACT OF 1975," at 6 (Sept. 1, 1976)).

The FOIA's right of access to public records is set forth in section 1–1522(a) which provides that "Any person has a right to inspect, and at his or her discretion to copy, any public record of the Mayor or an agency, except as otherwise expressly provided by § 1–1524...." Section 1–1524 enumerates the exemptions from the general disclosure mandate. Exemption 6 exempts:

> (6) Information specifically exempted from disclosure *by statute* (other than this section), provided that such statute:

---

7. Section 1004.5 contains an exception, not relevant here, permitting the release of records more than 10 years old if the offender was incarcerated for any part of the preceding 10–year period.

8. See note 3, *supra.* Appellees argued, in their motion for summary judgment, that Senator Kasten's waiver was incomplete and unknowing. We do not reach this issue. See note 4, *supra.*

9. The first step in construing any statutory provision is to examine the language of the statute to interpret its words according to their plain and ordinary meaning. *United States v. Bailey,* 495 A.2d 756, 760 (D.C.1985); *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1984) (en banc).

(A) Requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(B) Establishes particular criteria for withholding or refers to particular types of matters to be withheld.

D.C.Code § 1–1524(a)(6) (emphasis added).

Whether the MPD was required to release Senator Kasten's arrest records to appellants under the FOIA or properly withheld disclosure of the records under the Duncan Ordinance depends on whether the Duncan Ordinance, as promulgated by the Board of Commissioners, is a "statute" under FOIA Exemption 6. Thus we must decide whether the Board of Commissioners was vested with legislative authority that included the power to enact statutes, and this involves consideration of both the nature of the Commissioners' delegated authority and the intent of the D.C. Council when it enacted Exemption 6.

### A.

Between 1800 and 1871, the government in the District of Columbia was " 'strictly municipal in its character.' " *Filippo v. Real Estate Comm'n of the District of Columbia,* 223 A.2d 268, 270 (D.C.1966) (quoting *Metropolitan R.R. Co. v. District of Columbia,* 132 U.S. 1, 5, 10 S.Ct. 19, 21, 33 L.Ed. 231 (1889)). In 1871, Congress created a government for the District of Columbia with an elected two-chamber legislature, one of which, the Legislative Assembly, was vested with "legislative power ... extend[ing] to all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act...." Act of 1871 Creating Legislative Assembly, 16 Stat. 419, § 18 (February 21, 1871), 1 D.C. Code 97 (1981). The Legislative Assembly exercised full legislative powers, subject to repeal or modification by Act of Congress, until 1874, when Congress repealed the Act of 1871 and established a temporary three-member Board of Commissioners form of

government for the District. Temporary Organic Act of the District of Columbia, 18 Stat. 116 (June 20, 1874), 1 D.C.Code 104–09 (1981). Congress made this form of government permanent in 1878. Organic Act of 1878 of the District of Columbia, 20 Stat. 102 (June 11, 1878), 1 D.C.Code 110–17 (1981). In assessing the powers of the Board of Commissioners, the Supreme Court observed that "[l]egislative powers have now ceased, and the municipal government is confined to mere administration ... [T]he sovereign power of this qualified State is not lodged in the corporation of the District of Columbia, but in the government of the United States. Its supreme legislative body is Congress." *Metropolitan R.R. Co., supra,* 132 U.S. at 7, 9, 10 S.Ct. at 21, 22. The Supreme Court described the state of municipal government in the District after the 1874 and 1878 acts:

> The necessary operation of these provisions of the statutes [of 1874 and 1878] is to cause the District commissioners to be merely administrative officers with ministerial powers only. The sum of the municipal powers of the District of Columbia are neither vested in nor exercised by the District commissioners. They are, on the contrary, vested in the Congress of the United States, acting *pro hac vice* as the legislative body of the District, and the commissioners of the District discharge the functions of administrative officials.

*District of Columbia v. Bailey,* 171 U.S. 161, 176, 18 S.Ct. 868, 874, 43 L.Ed. 118 (1898).

However, in 1892, pursuant to its power to delegate its legislative authority, *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), Congress vested the Board of Commissioners with "local legislative power as respects 'reasonable and usual police regulations.' " *Id.* at 111 & n. 8, 73 S.Ct. at 1013 & n. 8.[10] In addition, Congress em-

---

**10.** "The Commissioners of the District of Columbia are authorized and empowered to make and enforce all such reasonable and usual police regulations ... as they may deem necessary for

the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia."

powered the Board of Commissioners to "make, modify, and enforce, under such penalties as they [*sic*] may deem necessary, all needful rules and regulations for the proper government, conduct, discipline and good name of said Metropolitan police force," 31 Stat. 819 (Feb. 28, 1901), 34 Stat. 221 (June 8, 1906), D.C.Code § 20–472 (1929), and mandated the keeping of general complaint books and other reports. D.C. Code §§ 20–485, –486, –488, –493 (1929). In fact, Congress delegated to the District of Columbia Board of Commissioners no fewer than 432 separate municipal legislative powers between 1878 and 1967. *See* Reorganization Plan No. 3 of 1967, 1 D.C. Code 130, 134–60 (1981). Thus, although the Board of Commissioners possessed no inherent legislative authority and Congress retained the plenary power to legislate for the District of Columbia, the Board of Commissioners became more than a mere administrative agency, possessing significant legislative authority obtained by a broad delegation of police power from Congress to "promulgate reasonable and usual police regulations." *District of Columbia v. John R. Thompson Co., supra,* 346 U.S. at 111, 73 S.Ct. at 1013; *see Filippo, supra,* 223 A.2d at 271; *Firemen's Ins. Co. v. Washington,* 157 U.S.App.D.C. 320, 324, 483 F.2d 1323, 1327 (1973); *see also* Message of the President, transmitting Reorganization Plan No. 3 of 1967, 1 D.C.Code 130, 165 ("The Council would be assigned

the quasi-legislative functions now performed by the Board of Commissioners.").

Determining the precise scope of the legislative authority delegated to the Board of Commissioners is not without difficulty, however. This arises from the very uniqueness of the District of Columbia within our governmental system.[11] *See Filippo, supra,* 223 A.2d at 272 ("[T]he District of Columbia is not in all respects a typical municipal corporation.").[12] The question of the breadth of legislative power delegated to the Board of Commissioners by Congress was considered by the Supreme Court in its landmark decision in *District of Columbia v. John R. Thompson, Co., supra,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480. In *Thompson,* the Court was faced with determining the viability of two antidiscrimination laws passed by the District's Legislative Assembly in 1872 and 1873. After reviewing the 1871 Act and the relationship between the Congress and the District of Columbia under the Constitution, the Court concluded that "the Congress had the authority under Art. I, § 8, cl. 17 of the Constitution to delegate its lawmaking authority to the Legislative Assembly of the municipal corporation which was created by the [1871 Act] and that the 'rightful subjects of legislation' within the meaning of § 18 of that Act *was as broad as the police power of a state*" so as to include laws prohibiting discrimination on the basis of race. *Id.* at 110, 73

Joint Resolution of February 26, 1892, 27 Stat. 394, D.C.Code § 20–34 (1929).

**11.** Indeed, it is the uniqueness of the District of Columbia within our governmental system that distinguishes the instant case from those decisions that discuss the differences between municipal regulations and state legislative enactments in terms of statewide applicability, *see, e.g., Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 96 n. 14, 95 S.Ct. 289, 293 n. 14, 42 L.Ed.2d 249 (1974) (the term "statute" has been "construed narrowly, to include only enactments of statewide application") (quoting *Moody v. Flowers,* 387 U.S. 97, 101, 87 S.Ct. 1544, 1548, 18 L.Ed.2d 643 (1967)), and those decisions that have construed the term "statute" in federal court jurisdictional provisions. *See, e.g., American Federation of Labor v. Watson,* 327 U.S. 582, 592–93, 66 S.Ct. 761, 765–66, 90 L.Ed. 873 (1946) ("the word 'statute' ... is a compendious summary of various enactments,

by whatever method they may be adopted, to which a State gives her sanction and is at least sufficiently inclusive to embrace constitutional provisions"). *Cf. John P. King Mfg. Co. v. City Council,* 277 U.S. 100, 116, 48 S.Ct. 489, 494, 72 L.Ed. 801 (1928) ("Laws or regulations adopted by a municipality are called, in common speech, either ordinances or by-laws, not 'statutes.' ") (Brandeis, J., dissenting).

**12.** In many respects the District is more akin to a state than to a municipality. The District is a unique entity in that it exercises "a great variety of governmental functions, including not only those which are commonly exercised by cities but others ... which are commonly exercised by states."
*Firemen's Ins. Co. v. Washington, supra,* 157 U.S.App.D.C. at 325, 483 F.2d at 1328 (quoting *Chewning v. District of Columbia,* 73 App.D.C. 392, 394, 119 F.2d 459, 461, *cert. denied,* 314 U.S. 639, 62 S.Ct. 74, 86 L.Ed. 513 (1941)).

S.Ct. at 1012 (emphasis added). Thus, it is clear that between 1871 and 1874, the Legislative Assembly was empowered to exercise full statutory authority, subject to repeal or modification by Congress, equivalent to the statutory authority of a state legislature. *See Tynes v. Gogos*, 144 A.2d 412, 416 (D.C.1958) (Legislative Assembly was a "legislative anomaly possessing dichotomous powers" to enact matters of general legislation as well as local regulations relating purely to municipal affairs).

The Court in *Thompson* also made clear, however, that even with the substantial delegation of police power by Congress to the Board of Commissioners in 1892, the Board of Commissioners' legislative authority was not as broad as that which Congress had delegated to the Legislative Assembly. There is language in *Thompson* which refers to the 1892 Act as delegating to the Board of Commissioners authority to repeal laws enacted by the Legislative Assembly. *Thompson, supra*, 346 U.S. at 114, 73 S.Ct. at 1014. Since the Court had already concluded that the Legislative Assembly's legislative power was equivalent to that of a state legislature, if the Board of Commissioners could repeal such statutes, it would follow that the Board of Commissioners also had the authority to enact statutes for the District of Columbia. However, although the Court stated that the legislative power of the Board of Commissioners under the 1892 Act could have been used to repeal the anti-discrimination laws passed by the Legislative Assembly, this statement was clearly premised on the Court's ruling that the laws, which prohibited racial discrimination in restaurants, were "matter[s] plainly within the scope of police regulation." *Id.* Other Supreme Court decisions are not to the contrary, and tend to view the Board of Commissioners' powers in an even more limited manner. *See, e.g., District of Columbia v. Bailey, supra*, 171 U.S. at 176, 18 S.Ct. at 874 ("the District Commissioners [are] merely administrative officers with ministerial powers only"); *Metropolitan R.R. Co. v. District of Columbia, supra*, 132 U.S. at 7, 9, 10

S.Ct. at 21, 22 ("municipal government confined to mere administration").

Nor do decisions by the courts of the District of Columbia suggest that the Board of Commissioners had legislative authority in the nature of the statutory authority of a state legislature. Indeed, numerous decisions by our courts have held that "[t]he legislative authority of the [Board of] Commissioners was limited to the enactment of 'reasonable and usual police regulations.'" *Newsweek Magazine v. District of Columbia Comm'n on Human Rights*, 376 A.2d 777, 782 (D.C.1977) (quoting *Mendota Apartments v. District of Columbia Comm'n on Human Rights*, 315 A.2d 832, 834 (D.C.1974)), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *see, e.g., Filippo, supra*, 223 A.2d at 270; *Savage v. District of Columbia*, 54 A.2d 562, 565 (D.C.1947); *Firemen's Ins. Co., supra*, 157 U.S.App.D.C. at 324, 483 F.2d at 1327; *Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington*, 142 U.S.App.D.C. 375, 379, 442 F.2d 123, 127 (1971); *Jones v. District of Columbia*, 116 U.S.App.D.C. 301, 304 & n. 2, 323 F.2d 306, 409 & n. 2 (1963); *LaForest v. Board of Commissioners*, 67 App.D.C. 396, 398, 92 F.2d 547, 549, *cert. denied*, 302 U.S. 760, 58 S.Ct. 367, 82 L.Ed. 588 (1937). Although there is language in some opinions suggesting a contrary notion, *e.g., Firemen's Ins. Co. v. Washington, supra*, 157 U.S.App.D.C. at 325, 483 F.2d at 1328 (police power is a "flexible and dynamic concept"), when the holdings of the courts are considered, it is clear they confirm only the Board of Commissioners' powers to enact "reasonable and usual police regulations" *Id.; see also Jones v. District of Columbia, supra*, 116 U.S.App.D.C. at 304 & n. 2, 323 F.2d at 309 & n. 2; *see generally* Mize, *A Guide to Deciphering the Laws of a Unique City–State Legislature—The Council of the District of Columbia*, 2 POTOMAC L.REV. 1, 11–13 (1979).

Of particular significance in this murky area is the fact that the D.C. Council itself has acknowledged a distinction between the regulatory powers of the pre-Home Rule Council and its post-Home Rule statutory

powers. The Home Rule Council[13] reenacted as a D.C. statute the Human Rights regulations, 34 DCRR § 1 *et seq.* (Nov. 17, 1973), which had been passed originally by the pre-Home Rule Council. D.C.Code § 1–2501 *et seq.* (D.C.Law 2–38, effective Dec. 13, 1977); *see National Broadcasting Co. v. District of Columbia Comm'n on Human Rights*, 463 A.2d 657, 659 & n. 1 (D.C.1983). The pre-Home Rule Council, like the Board of Commissioners before it, had only regulatory authority. The Home Rule Council had "become aware that in several court cases [in the District of Columbia Court of Appeals] serious questions have been raised concerning the power of the pre-Home Rule District Government to authorize some of the remedies contained in Title 34 [of the D.C.Rules and Regulations, the Human Rights regulations]." Committee Report on Bill No. 2–179, the Human Rights Act of 1977 (June 23, 1977); *see Newsweek Magazine, supra,* 376 A.2d at 782 n. 5 (quoting *Mendota Apartments, supra,* 315 A.2d at 835). The fact that the Council of the District of Columbia took such action prior to enacting the FOIA makes clear that it distinguished between the regulatory authority of its immediate predecessor and its own statutory powers under the D.C. Self–Government and Governmental Reorganization Act.[14]

Particularly relevant here as well, the Home Rule Council also saw fit to reenact as a D.C. statute certain discrete provisions of the Duncan Ordinance pertaining to juvenile arrest records. *See* D.C.Code §§ 16–2331 through 16–2336 (D.C.Law 2–22, effective September 23, 1977). Although these statutes provide nondisclosure rules similar to those contained in the Duncan Ordinance, the statutory provisions are more comprehensive, listing numerous nondisclosure exceptions, *see* D.C.Code § 16–2333 and providing criminal sanctions for their violation. *See id.* § 16–2336; *cf.* 1 DCMR § 10–1000.1–1000.3. Consequently, it is clear that the Council was not only aware of the distinction between its regulatory and statutory authority, but chose to exercise its statutory power to codify certain pre-Home Rule regulations in instances where the Council deemed it appropriate to do so.

■ Given this recognition by the Council which enacted the FOIA, it logically follows that the Home Rule Council would not view an ordinance promulgated by the Board of Commissioners as a statute for the purposes of Exemption 6. Rather, statutory authority remained, since 1874 and until the enactment of the Home Rule Act in 1973, with the Congress, and such delegated powers as it vested in the Board of Commissioners (and by Presidential Reorganization authority in the D.C. Council established in 1967) were no more than the regulatory powers of a municipality as distinct from the statutory powers of a state legislature.[15] This is not to suggest that the regulatory powers of the Board of Commissioners were insignificant. *See, e.g., Chewning, supra* note 11, 73 App.D.C. at 394, 119 F.2d at 461. But it is to recognize that except for a brief period in the 1870's, and since 1975 (when the Home Rule government commenced), the authority to enact statutes for the District of Columbia, in the same manner as is generally viewed as requiring action by a state legislature, resided with Congress and not with the Board of Commissioners established in 1874. Therefore, because the Board of Commissioners did not possess statutory authority, the Duncan Ordinance cannot be considered a statute under FOIA

---

13. The Home Rule Council is officially denominated the Council of the District of Columbia, D.C.Code § 1–222(a), as distinguished from the District of Columbia Council established under Reorganization Plan No. 3 of 1967, § 201(a), 1 D.C.Code 130 (1981).

14. Pub.L. No. 93–198, 87 Stat. 774 (Dec. 24, 1973); D.C.Code § 1–175 (1987 Repl.Vol.) (Home Rule Act).

15. Under the Home Rule Act, the D.C. Council's legislative authority is not the same as that of a state legislature since no Council enactment, except temporary emergency laws, becomes effective until the expiration of a Congressional layover period. D.C.Code §§ 1–201(a), 1–206, 1–229(a), 1–233(c)(1), (c)(2); *see Gary v. United States,* 499 A.2d 815 (D.C.1985), *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986).

Exemption 6.[16]

## B.

■ The FOIA's legislative history also does not suggest that the Council viewed the Duncan Ordinance as a statute falling within Exemption 6 or that the Council intended to use the term "statute" in Exemption 6 in a manner inconsistent with its ordinary meaning.[17]

The FOIA was one of many bills considered by the Council soon after the Home Rule Act, *supra* note 13, became effective. At the time the Council began its consideration of Bill No. 1–119, the "D.C. Freedom of Information Act of 1975," requests for information from the District Government were governed by Commissioner's Order No. 71–370 (Nov. 2, 1971).[18] This order, which was first promulgated by then Commissioner Walter E. Washington, and was later replaced by a substantially similar Mayor's Order No. 76–109 (May 4, 1976) promulgated by then Mayor Washington, contained a general provision mandating disclosure, subject to a number of exceptions, including an exception for "records specifically exempted from disclosure by

law." *Freedom of Information, supra* note 18, at 43, 45.

Bill No. 1–119 was introduced in the Council on June 10, 1975, in response to a number of compliance and enforcement problems that the Council perceived under the Commissioner's Order. *Id.* at 26. The bill as first introduced contained a general mandate of disclosure subject to only three exemptions: (1) trade secrets, (2) disclosures of a personal nature that would amount to a clearly unwarranted invasion of privacy, and (3) law enforcement records in six designated circumstances. *Id.* at 11–13. Conspicuously absent from the proposed bill was any exemption from disclosure for "records specifically exempted from disclosure by law" similar to that appearing in the Commissioner's Order or the federal Freedom of Information Act, 5 U.S.C. § 552 *et seq.*

In the course of its deliberations, the Council received comments and suggested amendments to Bill No. 1–119 from the Corporation Counsel and a number of interested groups and individuals. In testimony before the Council's Judiciary and Criminal Law Committee, William A. Robinson, As-

---

**16.** Our conclusion that the Board of Commissioners did not possess statutory powers renders the cases cited by the MPD, *e.g., Fund for Constitutional Government v. National Archives & Records Service,* 211 U.S.App.D.C. 267, 656 F.2d 856 (1981); *Founding Church of Scientology v. Bell,* 195 U.S.App.D.C. 363, 603 F.2d 945 (1979), inapposite. The issue presented in those cases, whether the federal rules of procedure are statutes within the meaning of Exemption 3 of the federal Freedom of Information Act, 5 U.S.C. § 552(b)(3) (the federal exemption comparable to Exemption 6 of the D.C. FOIA), turned on whether Congress, a body with statutory authority, positively enacted the rules after they were issued by the Supreme Court under rulemaking powers delegated by Congress. By contrast, the provisions of the Duncan Ordinance at issue were promulgated by the Board of Commissioners under its regulatory powers, and they have not been reenacted by the Home Rule Council, a body with statutory authority.

**17.** While our starting point in construing a statutory provision is the language itself, our primary goal is to ascertain and give effect to the intent of the legislative body that drafted the language. *Rosenberg v. United States,* 297 A.2d 763, 765 (D.C.1972) (quoting *General Motors Acceptance Corp. v. One 1962 Chevrolet Sedan,* 191

A.2d 140, 142 (D.C.1963)). The statutory meaning of a term must be derived from a consideration of the entire enactment against the backdrop of its policies and objectives. *Carey v. Crane Service Co.,* 457 A.2d 1102, 1105 (D.C. 1983) (quoting *Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.,* 206 U.S.App.D.C. 122, 128, 642 F.2d 527, 533 (1980)). Even where the words of a statute have superficial clarity, it is appropriate to undertake a review of the legislative history to aid in the ascertainment of legislative intent. *Office of People's Counsel v. Public Service Commission,* 477 A.2d 1079, 1084 (D.C. 1984) ("words are inexact tools at best") (quoting *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943)). Courts may depart from the literal meaning of words when they are at variance with legislative purpose as revealed by a reading of the legislative history or by an examination of the statute as a whole, *Peoples Drug Stores, Inc., supra* note 9, 470 A.2d at 754.

**18.** The legislative history of the FOIA is published in one volume. *See* Subcomm. on Administrative Practice & Procedure of the Senate Comm. on Judiciary, 95th Cong., 2d Sess., *Freedom of Information: A Compilation of State Laws* (Comm.Print 1978) (*Freedom of Information*).

sistant Corporation Counsel, praised the bill's purpose of requiring reasonable disclosure of information regarding governmental affairs, but noted:

> certain reservations with respect to the bill's provisions ... because the bill fails to include many of the significant exemptions provided in the Federal Freedom of Information Act and in Commissioner's Order 71–730....

*Freedom of Information, supra* note 18, at 54, 89. Accordingly, he advocated the adoption of an exemption like that contained in Commissioner's Order No. 71–370 for "records specifically exempted from disclosure from law" and observed that under the bill as introduced, juvenile arrest records would no longer be exempt from disclosure. *Id.* Mr. Robinson further suggested:

> It could serve a very useful purpose to the District if the present bill were modeled more closely after the Federal provisions governing freedom of information. Many courts have already construed the provisions of the Federal Act and thereby given a clarifying definition of its requirements. Such court precedents would serve as a useful guide in interpreting and construing such an act if it were adopted for the District.

*Id.*

The Council also received testimony from representatives of the American Civil Liberties Union (ACLU) who suggested two additional exceptions to disclosure which would reinforce the personal privacy of citizens. Noting "a tendency on the part of law enforcement agencies to erode the privacy guaranteed by [the Duncan Ordinance]," the ACLU advocated that the bill be amended "to make explicit the fact that privacy of arrest records under the Duncan Ordinance or any future modification of the ordinance will not be altered as a result of the D.C. FOIA." *Freedom of Informa-*

*tion, supra* note 18, at 81.[19]  The District of Columbia Bar Committee on Access to Government Information also noted that the federal Freedom of Information Act contained exemptions from disclosure not found in Bill No. 1–119. In contrast to the ACLU and the Corporation Counsel, however, the Bar Committee urged that "all legitimate interests in confidentiality are already protected by the specific exceptions from mandatory disclosure [in Bill No. 1–119], and so an exception allowing withholding under other statutes is unnecessary." *Id.* at 103.

The Council in addition had before it a legal memorandum, prepared by the Legislative Research Center of the Georgetown University Law Center, which contained a comparative analysis of the proposed bill, the federal Freedom of Information Act and Commissioner's Order No. 71–370. *Id.* at 171 *et seq.* After noting that the proposed bill lacked any provision addressing records exempted from disclosure by law, *id.* at 163, the memorandum stated, "If the Council intends that this bill would govern only the release of information not otherwise covered by law, then an exemption for materials otherwise exempted by statute should be included." *Id.* at 198.

On September 1, 1976, the Council Committee on the Judiciary and Criminal Law reported a revised bill. *Freedom of Information, supra* note 18, at 19, 25. Among other changes, Bill No. 1–119 had been revised to include an exemption for "[i]nformation specifically exempted from disclosure by statute." *Id.* at 21. The committee explained that "[t]he only exemptions from disclosure on which the Mayor's Order and Bill No. 1–119 are in alignment are the exemptions for unwarranted invasion of personal privacy and for information exempt by statute." *Id.* at 32. Noting that the amended bill incorporated most of the suggestions made by the Cor-

---

**19.** A representative from Common Cause, a public interest group, also noted that "[m]ost freedom of information laws contain an exemption for records deemed confidential by other statutes" and that "[t]he Committee may want to consider adding this exemption." The Committee also heard testimony from representatives of

the D.C. Public Interest Research Group, the Apartment and Office Building Association, the Capitol Hill Restoration Society, the Chesapeake & Potomac Telephone Company, the Jewish Community Council of Greater Washington and a private citizen.

poration Counsel, the report observed that the "federal model should be followed because of the strength of the case law" and, "[i]n particular, exemption should be provided for information now exempt from disclosure by statute...." *Id.* at 34–35. In its section-by-section analysis, the Committee report explicitly stated as to the exemption for "information specifically exempted from disclosure by statute" that "[t]he committee worded the language of this exemption so as to parallel the federal Act." *Id.* at 39.

Prior to passage, Bill No. 1–119 was revised one final time to incorporate changes to the federal Freedom of Information Act passed by Congress during the Council's consideration of the pending FOIA bill. In the Council's debate on Bill No. 1–119 on October 12, 1976, Councilmember David Clarke, Chairperson of the Committee on the Judiciary and Criminal Law, explained the revision to Exemption 6:

> That provision exempts from the disclosure requirement of the Bill information specifically by statute. In the federal experience this was the original language. It is from the original federal Freedom of Information Act that they found that it was interpreted too broadly by the Supreme Court of the United States. It is after the Supreme Court of the United States [interpreted] this exemption as broadly exempt[ing] material from disclosure that the Congress of the United States passed, with respect to the federal law, an amendment very similar to the one that I am proposing before this Council today.
>
> The Executive Branch has indicated that if we are to have a Freedom of Information Act, it would be good for it to parallel with that so it would provide some basis of construction around it.
>
> In that sphere and in order to have our laws as effective to [sic] the District of Columbia citizens as the federal law is for the national statutes which exempts disclosures[, our bill] must require that such matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes [sic] particular criteria for withholding or refers

[sic] to particular types of matters to be withheld.

*Freedom of Information, supra* note 18, at 65. The Council voted to adopt the revised version of Exemption 6 and the FOIA took effect, in its current form, on March 29, 1977. *Id.* at 72.

Thus, the FOIA's legislative history does not suggest, as the MPD urges, that the Council specifically contemplated that the Duncan Ordinance was a statute within the meaning of Exemption 6. Rather, the history is clear that the Council adopted Exemption 6 to address the initial bill's failure to include an exemption similar to that appearing in the Commissioner's Order or the federal Freedom of Information Act. Although the representative from the ACLU specifically mentioned the Duncan Ordinance in his testimony, he was the only witness to do so; at no point in the legislative history does the Council refer to the ACLU's testimony or to the Duncan Ordinance. By contrast, the Corporation Counsel, the Legislative Research Center of the Georgetown University Law Center, and several other witnesses expressly urged the Council to correct the deficiency in the initial bill, and the Council responded by doing just that.

The legislative history similarly reveals no indication that the Council intended to use the term "statute" in Exemption 6 in a manner inconsistent with its ordinary meaning. Indeed, in contrast to Exemption 6's language exempting "[i]nformation specifically exempted from disclosure by *statute*," Exemption 7, which protects information classified by a presidential executive order, provides an exemption for "[i]nformation specifically authorized by federal *law*...." (Emphasis added.) It is thus apparent that the Council distinguished between the use of the terms "statute" and "law" in Exemptions 6 and 7 to account for differing circumstances: the law referred to in Exemption 7 is an executive order which, like the Duncan Ordinance, has the full force and effect of law but is not a statute. Therefore, we find no persuasive reason for construing the word "statute" in

Exemption 6 in a manner inconsistent with its plain and ordinary meaning. *See Peoples Drug Stores, Inc., supra* note 9, 470 A.2d at 755 (citing *Tuten v. United States,* 440 A.2d 1008, 1013 (D.C.1982), *aff'd,* 460 U.S. 660, 103 S.Ct. 1412, 75 L.Ed.2d 359 (1983)); *see also National Insulation Transp. Comm. v. ICC,* 221 U.S.App.D.C. 192, 196, 683 F.2d 533, 537 (1982) (courts presume that the use of different terminology within a statute indicates an intent to establish different meaning).

Accordingly, we hold on the basis of the plain language of the FOIA, its pro-disclosure mandate, its legislative history and the Home Rule Council's recognition of the limited nature of the Board of Commissioners' legislative authority that the Duncan Ordinance is not a statute within the meaning of FOIA § 1–1524(a)(6). Although the Duncan Ordinance continues to have the full force and effect of law, *Spock v. District of Columbia,* 283 A.2d 14, 19 (D.C. 1971); *In re Alexander,* 259 A.2d 592, 593 (D.C.1969),[20] it is not a statute authorizing the MPD to withhold the disclosure of arrest records otherwise available under the FOIA, and we reverse the grant of summary judgment in favor of appellees.

**20.** The MPD has misconceived the issue in the case by framing it in terms of whether the Council implicitly repealed the Duncan Ordinance when it enacted the FOIA. Although the Duncan Ordinance is not a statute within the meaning of Exemption 6, the ordinance continues to have vitality outside the arena of the FOIA. The Duncan Ordinance will continue to restrict the government's use and dissemination of arrest records, ensuring that such records are released only for legitimate law enforcement purposes, and will protect against the routine dissemination of arrest records for non-law enforcement purposes, *e.g.,* employment applications, licensing agencies, and credit institutions. *See Morrow, supra* note 5, 135 U.S.App.D.C. at 171, 417 F.2d at 742. Moreover, the FOIA itself protects against the routine dissemination of police records. *See* D.C.Code § 1–1524(a)(3) (exempting from disclosure "Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would: ... (C) Constitute an unwarranted invasion of personal privacy.").